**Robert HARRIS, et al., Plaintiffs.**

v.

**FLORIDA ELECTIONS CANVASSING COMMISSION, et al., Defendants.**

**Steven Medina, et al., Plaintiffs,**

v.

**Florida Elections Canvassing Commission, et al., Defendants.**

**Nos. 4:00CV453, 4:00CV459.**

United States District Court, N.D. Florida, Tallahassee Division.

Dec. 9, 2000.

---

**1318**

Randy M. Weber, Miami, FL, Roger Bernstein, New York City, for Robert N. Harris, Jill Katz, Robin K. Adair, Marcel Del Prado, Jack J. Albuquerque, Marion Albuquerque, plaintiffs.

John W. Little, III, Steel Hector & Davis LLP, West Palm Beach, FL, George N. Meros, Jr., Gray Harris &

Robinson PA, Tallahassee, FL, Larry M. Haag, Citrus Co. Atty., Inverness, David G. Tucker, Escambia County Attorneys Office, Pensacola, FL, D. Michael Chesser, Chesser, Wingard Barr, Shalimar, Thomas Victor Dannheisser, Santa Rosa County, Milton, FL, Kenneth Wayne Sukhia, Fowler, White, Gillen, Tallahassee, FL, for Florida Elections Commission, Florida Elections Canvassing Commission, Kathleen Harris, Jeb Bush, Governor, County Canvassing Board of Bay County, Melanie Williams–Boyd, County Canvassing Board of Bay County, County Canvassing Board of Brevard County, Fred D. Galey, County Canvassing Board of Citrus County, Susan Gill, County Canvassing Board of Clay County, Barbara Kirkman, County Canvassing Board of Duval County, John Stafford, County Canvassing Board of Escambia County, Bonnie M. Jones, County Canvassing Board of Manatee County, Robert Sweat, County Canvassing Board of Okaloosa, Patricia M. Hollarn, County Canvassing Board of Santa Rosa County, P. Douglas Wilkes, Jr., County Canvassing Board of Seminole County, Sandra S. Goard, George Bush, Richard Cheney, defendants.

### ORDER

PAUL, Senior District Judge.

The plaintiffs in these cases originally brought suit in Florida state circuit courts challenging the counting of overseas absentee ballots received after 7 p.m. on election day. The plaintiffs in the case eventually styled 4:00cv453 originally based their complaint on alleged violations of various provisions of state and federal law. The plaintiffs in that case then filed an amended complaint which referred only to alleged violations of state law. After the amended complaint was filed, defendant Governor Jeb Bush filed a Notice of Removal of this case to federal court.[1]

1. The original notice of removal in 4:00cv453 did not indicate that all defendants consented to the removal. However, the defendants quickly filed a separate notice of consent to removal which was signed by all defendants. The Court notes that notice and consent requirements have been held to be procedural rather than jurisdictional requirements. Due

The Court directed the parties in the case eventually styled 4:00cv453 to brief the issues of removal and the parties filed various memoranda, with the plaintiffs styling theirs as a motion to remand. The Court scheduled a hearing on the removal issue and also on the merits if removal were found to be appropriate. The parties then filed various memoranda, motions to dismiss and motions for summary judgment addressing the merits of this case.

When the removal hearing was held, the Court was made aware of the pendency of the case eventually styled as 4:00cv459 in a Florida state circuit court, and was informed by the defendants, who were essentially the same in both cases, that the 4:00cv459 case would also be removed and that a motion to transfer the case to this Court would be made under the related

case doctrine. The Court then held the hearing on removal issues regarding 4:00cv453, after which the Court found that removal was proper.[2] The Court then directed that a hearing on the merits would be held the following day, in part to allow the removal and transfer procedures in what eventually became case 4:00cv459 to take place.

The following day, before the hearing on the merits, the defendants in the case now styled 4:00cv459 indicated to the Court that a notice of removal and a motion to transfer that case to this Court pursuant to the related case doctrine had in fact been filed. The Court thus gave Mr. Terris, attorney for the plaintiffs in the case now styled as 4:00cv459, an opportunity to argue for remand. The Court then denied his motion for remand and granted the

to the necessarily rushed nature of this proceeding, and the fact that consent to removal was quickly obtained, the Court excuses the slight procedural error of a lack of uniform consent to removal in the original notice.

2. As noted above, the first issue facing the Court involved the propriety of removing this case to federal court. Generally, the inquiry whether federal question jurisdiction exists under 28 U.S.C. § 1331 is guided by the well-pleaded complaint rule, which states that 'federal jurisdiction exists only when a federal question is presented on the plaintiff's properly pleaded complaint.' *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)). Since a defendant may remove a case only if the claim could have been brought in federal court, 28 U.S.C. § 1441(b), the question for removal jurisdiction must also generally be determined by reference to the 'well-pleaded complaint.' *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 808, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986). Moreover, if the federal issue arises only as a federal defense and does not appear on the face of a wellpleaded complaint, it as a general rule does not authorize removal to federal court. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987)).

The Court finds, however, that the plaintiffs in this case have artfully pled their case to avoid the obviously federal character of the issues they claim. Further, the Court finds that the plaintiffs' "right to relief necessarily depends on resolution of a substantial ques-

tion of federal law" *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal.*, 463 U.S. 1, 13, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983). The plaintiffs' purported state law complaint, on its face, obviously seeks to overturn a prior federal ruling which directly covered the issues presented in the purported state law complaint.

Additionally, this case involves the deprivation of what the United States Supreme Court calls "a fundmental political right, because preservative of all rights". *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *see also Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("Undeniably, the Constitution of the United States protects the rights of all qualified citizens to vote, in state as well as in federal elections."); *Ex parte Yarbrough*, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884). Most recently, in *Bush v. Palm Beach County Canvassing Bd.*, — U.S. —, 121 S.Ct. 471, — L.Ed.2d — (2000), the United States Supreme Court implicitly adopted the view that this overriding concern justifies a federal court reviewing state election procedures. In its order vacating and remanding the opinion of the Florida Supreme Court, the United States Supreme Court declined to defer to the state court's interpretation of the state's own law because "the law enacted by a state legislature was applicable not only to elections for state offices, but also to the selection of Presidential electors." Our case obviously involves the same issues. For all the above reasons, this Court finds that removal of this case was appropriate.

motion to transfer the case to this Court under the related case doctrine. Argument was then heard on the merits on both cases, and thus these cases are ready for adjudication.

The plaintiffs in both cases characterize their causes as arising under Florida's Election Contest Statute, Section 102.168, Fla. Stat. (2000). The plaintiffs claim, and the parties stipulated, that 2,411 absentee ballots from overseas electors (hereinafter referred to as "overseas absentee ballots") were received after election day and were included in the final certificate of election results by the Florida Elections Canvassing Commission. The plaintiffs claim that this violates Section 101.67(2) Fla. Stat. (2000), which states:

> All marked absent electors' ballots to be counted must be received by the supervisor by 7 p.m. the day of the election. All ballots received thereafter shall be marked with the time and date of receipt and filed in the supervisor's office.

Because this statute uses mandatory language like "must" and "shall", the plaintiffs urge that any absent electors' ballots, including overseas absentee ballots, must have been received by 7 p.m. on November 7, 2000, in order to be legally included in the election results.

The parties stipulated that 1,575 of the overseas absentee votes received after November 7th went for Bush/Cheney and 836 votes went for Gore/Lieberman. Thus, the overseas absentee votes received after November 7th resulted in a net gain to Bush/Cheney of 739 votes. Additionally, the parties agreed that the certified difference between the two candidates in the state as a whole was 537 votes, in favor of Bush/Cheney. Thus, if all the overseas absentee votes received after November 7th were excluded, the result would be that Gore/Lieberman would have an advantage over Bush/Cheney of 202 votes (not considering, of course, the outcomes of the myriad other lawsuit pending around the state and federal systems).

Based on the above, the plaintiffs conclude that including the overseas absentee ballots received after election day in the final certification totals constituted "[r]eceipt of a number of illegal votes ... sufficient to change or place in doubt the result of the election" under § 102.168(3)(c) Fla. Stat. (2000). Section 102.168 allows any unsuccessful candidate or any elector qualified to vote to contest, in the circuit court, the certification of election of any person to office. Section 102.168(7) entitles the contestant to "an immediate hearing" and subsection (8) states:

> The circuit judge to whom the contest is presented may fashion such orders as he or she deems necessary to ensure that each allegation in the complaint is investigated, examined, or checked, to prevent or correct any alleged wrong, and to provide any relief appropriate under such circumstances.

Based on this section of the Florida Statutes, the plaintiffs sought an order including the following relief:

A.   declaring that all votes that the defendants received and counted after November 7, 2000 at 7 p.m. were illegally counted;

B.   ordering that said illegally counted votes be subtracted from the certified total for each candidate in the Presidential and Vice–Presidential election;

C.   ordering that a new certification as to the votes case by electors in Florida for the nominees for President and Vice–President, without any illegally case absentee ballots, be made by defendant Harris; and

D.   ordering the defendant Jeb Bush, as Governor of the State of Florida, to transmit to the President of the United States Senate a corrected certificate of ascertainment as to the electors selected by the State of Florida in the Presidential and Vice–Presidential elections on November 7, 2000.

The defendants responded by arguing that the Court should not apply a hyper-

technical application of the deadline in the statute but must consider the effect of the earlier litigation in *United States v. Florida,* No. TCA–80–1055 (N.D.Fla.1982), the consent decrees which were entered in the case, and of the Florida Administrative Code Rule 1S–2.013(7) which was promulgated as a result of that litigation. Because this earlier litigation is crucial to the present case, a detailed discussion of the tense interplay between the United States, the district court and the legislature of Florida that was involved in that case is necessary.

In 1980, the Attorney General of the United States sued the State of Florida to enforce the provisions of the Overseas Citizens Voting Rights Act (OCVRA), 42 U.S.C. §§ 1973dd, *et seq.* and the Federal Voting Assistance Act (FVAA), 42 U.S.C. §§ 1973cc(b).[3] Florida was represented by its Secretary of State, the Chief Elections Officer in the State.[4] The OCVRA guarantees that citizens outside the United States have the right to register and vote absentee in federal elections in the state where they were last domiciled so long as they meet certain minimum requirements.

The FVAA provides, among other things, that members of the Armed Forces and the Merchant Marine located abroad, and who are otherwise qualified to vote, have the right to vote in the state of their voting residence.

The complaint in the 1980 case alleged that because of the late scheduling of primary elections in Florida in 1980, and the fact that the counties were sending out absentee ballots only after the conclusion of the primaries, most counties were not sending out the absentee ballots until at most 20 days before the election and in some cases not until only several days before the election. The complaint concluded that this lateness threatened to deprive these voters of their right to vote by making it impossible for them to mail in their overseas absentee ballots in time to meet the 7 p.m. election day deadline in Fla. Stat. § 101.67(2).

In 1980, Judge Stafford entered a Temporary Restraining Order, recognizing the late mailing out of the ballots and directing that overseas absentee ballots for the federal elections of November 6, 1980 should

3. For a thorough and well written history of the OCVRA and the FVAA refer to the order entered December 8, 2000 by Judge Collier in the case of *George W. Bush, et al. v. Hillsborough County Canvassing Bd., et al.,* 3:00cv533 (Dec. 8, 2000). That history is hereby adopted and incorporated herein by reference.

4. Under Fla. Stat. § 97.012, the Secretary of State is dubbed the chief elections officer, and has the responsibility to "obtain and maintain uniformity in the application, operation, and interpretation of the registration laws." *See also Consent Decree in United States v. Florida,* TCA–80–1055 (entered April 2, 1982) ¶ 4. The Secretary of State has the authority to bind the State of Florida when the Secretary is the legal representative of the State in a legal proceeding. The Florida Supreme Court in *State ex rel. Landis v. Thompson* 120 Fla. 860, 163 So. 270 (1935), recognized the authority of the Secretary to represent and bind the State over 6 decades ago:

Furthermore, where the validity of the submission of a proposed joint resolution of three-fifths of each House of the Legislature as a proposed constitutional amendment is duly litigated by a citizen prior to its being published and voted on, the effect of a judicial decision holding the submission to be valid, and the pending publication of the amendment to be in conformity to the organic law, and refusing to enjoin it, becomes binding on the state which is represented in such litigation by its secretary of state. The state being bound by such judicial decision, it consequently becomes binding on all who claim under the state, as does the respondent in this case, and this is so even though respondent was not a direct party to such litigation, nor did he actually participate in the same. Respondent, in common with plaintiff in that suit, was privileged to intervene in such litigation. Such litigation, in its essence, contemplated a judicial decree declaratory of the validity vel non of what was being proposed as an amendment to the Constitution. As such it was required to be considered by the court with a view to settling in advance, not only all objections that were therein being urged, but all valid objections that might have been urged....
*Id.* at 277–78.

be received and counted if they were received within 10 days of election day.

Later in the case, as the 1982 election loomed near, the State of Florida, represented by the Secretary of State,[5] reached an agreement with the United States, represented by the United States Attorney General, and entered into a consent decree covering the 1982 election. In that consent decree, the State of Florida agreed (1) to accept, for the November 2, 1982 federal elections, overseas absentee ballots received until 5 p.m. November 12, 1982; (2) to inform overseas absentee voters of the ten-day extension; and (3) to mail out the absentee ballots at least 35 days prior to the election.

The 1982 consent decree also addressed a method of achieving a lasting solution to this problem for future elections. It required the state to submit, within 60 days after the close of the 1983 regular session of the Florida Legislature, a plan of compliance which "shall effect such measures as are necessary and appropriate to permit American citizens located abroad a reasonable opportunity to return their ballots for federal primary ... and general elections prior to the deadline for receipt of ballots." The consent decree also noted that

> The time period provided, within which the Plan shall be submitted to the Court, will permit the Florida Legislature to study and act on this matter. However, if the Florida Legislature does not act, a Plan of Compliance nevertheless shall be submitted by the date specified above.

> After submission of the Plan of Compliance, plaintiff United States of America shall be given a reasonable opportunity to study and comment on the Plan. The Court thereupon may determine that the Plan adequately resolves the voting problems that are the subject of this litigation or may order such additional relief it determines is necessary and appropriate.

The 1983 regular session of the Florida Legislature met and passed a measure responding to the Court's order. According to a series of memoranda from Sylvia Alberdi, the Staff Analyst Director for the State Senate legislative committee that dealt with this issue (Defts.Exh. H), the Florida Legislature considered—and rejected—the 35–day deadline proposed by the district court, finding that the 35–day deadline would "place the first primary in July when a large majority of Florida citizens are away on vacation", thus "disenfranchis[ing] many more voters than the few overseas who may not return their ballots in time to be counted." Instead, the Florida Legislature passed a bill which set an earlier qualifying period for federal candidates, shortened the schedule between first and second primaries and the general election, and required that absentee ballots be mailed 30 days (as opposed to 35 days) before the general election. The memoranda at Defts. Exh. H did not indicate that it was the Legislature's desire to have a 10–day extension to the ballot receipt deadline. Instead, the memorandum characterized the 10–day extension for the 1982 election as merely "an interim solution."

After the Legislature met and failed to impose the 35–day deadline for mailing out absentee ballots, the United States complained that the Plan did not meet the requirements of the Court's order. In February 1984, the Court issued a show cause order, directing the defendant to show cause why it submitted a Plan that did not meet the requirements of the consent decree. A hearing was held in March of 1984.

It was at this point that the memoranda at Exh. H were written, especially the one written to Howard Walton. That memorandum revealed the degree to which the state legislature had considered passing the requirements in the consent decree and revealed the tension between the leg-

---

**5.** See fn 4, *supra.*

islature and the United States on these issues. For example, the memorandum indicated that the committee which considered this issue felt that the bill was "a good faith effort on the part of the State of Florida to comply with the Consent Decree" and that the "matter was discussed at length in committee." The memorandum concluded by highlighting the tension which existed between the United States and the state legislature: "Chapter 83–251 should at a minimum be allowed to stay in place for the 1984 elections to determine the effect of the changes. It does not seem equitable that the Justice Department did not take into consideration *all* of the efforts of the Legislature to facilitate voting procedure for overseas voters."

Despite these objections from the state legislature, the Court entered an order on June 15, 1984, essentially finding that the attempt by the state legislature to remedy the violations of the OCVRA and the FVAA was insufficient and requiring the State to submit a revised Plan which satisfied the consent decree entered in 1982. This Plan included what would eventually be called Florida Administrative Code Rule 1C–7.13, and which would eventually be renumbered as Florida Administrative Code § 1S–2.013. In direct response to the direction of the Court, the revised Plan and eventually § 1S–2.013 required the 35–day advance mailing of absentee ballots and required the 10–day extension in the receipt of overseas absentee ballots in federal elections. The provisions of that rule have been followed by Florida since 1984 and were followed in the 2000 election.

The detailed history of the litigation before Judge Stafford reveals that the 1984 order, approving the Plan and the Administrative Rule, was intended as a ruling that Fla. Stat. 101.67(2) was in conflict with the OCVRA and the FVAA with regard to federal elections. Thus, that order should be read to invalidate the statute to the extent it disagreed with the order. But, it should be recognized that, as in all cases where a state statute is found to conflict with a federal statute, the state statute did not, of course, immediately vanish from the books. Instead the statute must be read in conjunction with the judicial interpretation of it.

In the typical situation, a citizen must be aware of the relevant court authority, look it up in case books, and read it in conjunction with the statute to determine the state of the law. In the 1984 order, however, Judge Stafford went one step further toward clarity and accessibility. Rather than merely putting the 35–day deadline and other requirements in an order which would reside in a law book where hopefully election officials would know to look, Judge Stafford opted for a more obviously accessible solution. He directed that the required provisions be put into the Administrative Code, where election officials and citizens will naturally refer to determine the procedures for voting.

In short, Judge Stafford ordered that the state statute would run afoul of two federal laws, the OCVRA and the FVAA, unless the administrative rule were engrafted onto the statute. Thus, the Administrative Rule was not, as the plaintiffs characterized it, the product of a rebellious state executive branch flouting the authority of the state legislature. Instead, it was the product of the state executive branch, the authorized representative of the state in a lawsuit against the state,[6] enacting a measure to bring the state into compliance with a federally ordered mandate in a situation where the state legislature refused to do so.

Thus, to the extent that Fla. Stat. § 101.67(2) conflicts with administrative rule § 1S–2.013, it is the administrative rule which must win the day. This is the opposite of the traditional interplay between the administrative code and the state statutes, but is in recognition of the fact that the administrative code mechanism was merely the expression of a feder-

---

**6.** See fn 4, *supra.*

al court detailing, in an easily accessible way, the manner in which a state must remedy its statute's conflict with federal law.

The fact that this rule has been in effect, without controversy or attempt by the legislature to overrule it, is a recognition by the legislature that they were subject to the Court's authority as expressed through the administrative rule. The legislature attempted to convince the Court to take another route, including a 30–day deadline, but the Court rejected their proposal. The lack of legislative challenge to the administrative rule reveals that the legislature itself understood that the rule was part and parcel of the Court's order.

The lack of challenge also reveals a recognition that the administrative code provision was properly enacted by the state executive branch to allow the state to comply with federal law and thus that the Rule should not be read to be in conflict with the statute but instead to be engrafted onto it, to allow the entire voting procedural scheme to comply with federal law. In other words, there simply is no conflict here—giving effect to the rule is actually giving effect to the statute, for they are parts of the same whole and, together, represent the end product of a federally ordered mandate.

In light of the above discussion, several arguments of the plaintiffs melt away. First, as alluded to above, the plaintiffs seek to have the Court consider the Administrative Rule and § 101.67(2) without regard to the context of how they came about. Thus, they argue that the statute and the administrative provision conflict, and that the administrative provision must yield. As discussed above, the administrative rule should be considered the equivalent of a federal court order detailing how a state statute conflicts with a federal statute and setting out what must be done about it. Thus, it is the statute which must yield when federal elections are involved.

Next, the plaintiffs argue that the consent decree is merely an agreement between the executive branch of the State and the United States Justice Department which cannot bind the people of Florida or the legislature. This interpretation fails for two reasons. First, when a state is sued with regard to its election laws, the proper state representative is the chief elections officer. That representative has the authority to bind the state as a whole, and not merely the executive branch. Second, the history of the litigation before Judge Stafford shows that the state legislature was not merely standing off to the side, but that it recognized its duty to attempt to participate in fashioning a remedy and was fully involved in attempting to enact statutes to satisfy the federal decree.

The plaintiffs also turn to the United States Constitution and federal statutes to find a basis for invalidating the 10–day extension. First, the plaintiffs cite Article II, § 1, clause 3, which states "The Congress may determine the Time of chusing Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." As an initial matter, the Day that "shall be the same throughout the United States" is the Day that the already-chosen Electors give their votes, not the "Time of chusing" them. Thus, this clause, standing alone does not require that individual voters all choose the Electors on the same day. However, the clause does allow Congress to set the "Time for chusing" the Electors and Congress has done so. Title 3 U.S.C. § 1 states that "the electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November, in every fourth year succeeding every election of a President and Vice President."

The plaintiffs apparently urge that this means that every vote must be made by a voter and counted by election officials by midnight on that day. As we know from this election, while it is possible for everyone to vote on election day, it is highly

unlikely that every precinct will be able to guarantee that its votes would be counted by midnight on election day. This has been the case for years, yet votes are not routinely being thrown out because they could not be counted on election day.

The Court notes that Judge Stafford's orders and the Administrative Rule were careful to require that the votes to be counted be mailed or signed by election day. In other words, overseas absentee voters, like all the rest of the voters, cast their votes on election day. The only difference is when those votes are counted. Thus, this case comes down to having very little difference from the typical voting and vote-counting scenario. Routinely, in every election, hundreds of thousands of votes are cast on election day but are not counted until the next day or beyond.

The federal government has surely been aware of this practice, and has surely been aware of the eight states around the country which allow post-election-day acceptance of absentee ballots. However, no state has been sued by the federal government for such practices, which lends further support to the notion that Congress did not intend 3 U.S.C. § 1 to impose irrational scheduling rules on state and local canvassing officials, and certainly did not intend to disenfranchise voters whose only reason for not being able to have their ballots arrive by the close of election day is that they were serving their country overseas.

For the above reasons, it is hereby

**ORDERED AND ADJUDGED:**

1. Plaintiffs are not entitled to relief under Fla. Stat. § 102.168 or any other provision of state or federal law. Judgment shall be entered for the defendants.

2. All motions not expressly ruled on in this order are severally denied as moot.

3. Due to the time constraints involved in this case, the plaintiffs may file a notice of appeal via facsimile. However, plaintiffs are directed to send the filing fee and to meet the other procedural requirements forthwith.