814 A.2d 1028

THE NEW JERSEY DEMOCRATIC PARTY, INC.; THE NEW JERSEY DEMOCRATIC STATE COMMITTEE, AND THE HON. BONNIE WATSON COLEMAN, IN HER OFFICIAL CAPACITY AS CHAIR OF THE NEW JERSEY DEMOCRATIC PARTY AND OF NEW JERSEY DEMOCRATIC STATE COMMITTEE; AND JOHN OR JANE DOE, YET TO BE SELECTED DEMOCRATIC PARTY CANDIDATE FOR THE OFFICE OF UNITED STATES SENATOR, STATE OF NEW JERSEY, PLAINTIFFS–APPELLANTS, v. HON. DAVID SAMSON, ATTORNEY GENERAL, STATE OF NEW JERSEY, IN HIS OFFICIAL CAPACITY; HON. REGENA THOMAS, SECRETARY OF STATE OF THE STATE OF NEW JERSEY IN HER OFFICIAL CAPACITY; HON. RAMON DE LA CRUZ, DIRECTOR OF NEW JERSEY DIVISION OF ELECTIONS; HON. MICHAEL J. GARVIN, CLERK, COUNTY OF ATLANTIC, IN HIS OFFICIAL CAPACITY; HON. KATHLEEN A. DONOVAN, CLERK, COUNTY OF BERGEN, IN HER OFFICIAL CAPACITY; HON. PHILIP E. HAINES, CLERK, COUNTY OF BURLINGTON, IN HIS OFFICIAL CAPACITY; HON. JAMES BEACH, CLERK, COUNTY OF CAMDEN, IN HIS OFFICIAL CAPACITY; HON. ANGELA F. PULVINO, CLERK, COUNTY OF CAPE MAY, IN HER OFFICIAL CAPACITY; HON. GLORIA NOTO, CLERK, COUNTY OF CUMBERLAND, IN HER OFFICIAL CAPACITY; HON. PATRICK J. MCNALLY, CLERK, COUNTY OF ESSEX, IN HIS OFFICIAL CAPACITY; HON. JAMES N. HOGAN, CLERK, COUNTY OF GLOUCESTER, IN HIS OFFICIAL CAPACITY; HON. JANET E. HAYNES, CLERK, COUNTY OF HUDSON, IN HER OFFICIAL CAPACITY; HON. DOROTHY K. TIRPOK, CLERK, COUNTY OF HUNTERDON, IN HER OFFICIAL CAPACITY; HON. CATHERINE DICOSTANZO, CLERK, COUNTY OF MERCER, IN HER OFFICIAL CAPACITY; HON. ELAINE M. FLYNN, CLERK, COUNTY OF MIDDLESEX, IN HER OFFICIAL CAPACITY; HON. M. CLAIRE FRENCH, CLERK, COUNTY OF MONMOUTH, IN HER OFFICIAL CAPACITY; HON. JOAN BRAMHALL, CLERK, COUNTY OF MORRIS, IN HER OFFICIAL CAPACITY; HON. M. DEAN HAINES, CLERK, COUNTY OF OCEAN, IN HIS OFFICIAL CAPACITY; HON. RONNI D. NOCHIMSON, CLERK, COUNTY OF PASSAIC, IN HER OFFICIAL CAPACITY; HON. GILDA T. GILL, CLERK, COUNTY OF SALEM, IN HER OFFICIAL CAPACITY; HON. R. PETER WIDIN, CLERK, COUNTY OF SOMERSET, IN HIS OFFICIAL CAPACITY; HON. ERMA GORMLEY, CLERK, COUNTY OF SUSSEX, IN HER OFFICIAL CAPACITY; HON.

JOANNE RAJOPPI, CLERK, COUNTY OF UNION, IN HER OFFICIAL CAPACITY; HON. TERRANCE D. LEE, CLERK, COUNTY OF WARREN, IN HIS OFFICIAL CAPACITY; MR. DOUGLAS FORRESTER, CANDIDATE FOR THE UNITED STATES SENATE (REPUBLICAN); MR. TED GLICK, CANDIDATE FOR THE UNITED STATES SENATE (GREEN PARTY); MS. ELIZABETH MACRON, CANDIDATE FOR THE UNITED STATES SENATE (LIBERTARIAN PARTY); AND MR. NORMAN E. WAHNER, CANDIDATE FOR THE UNITED STATES SENATE (NEW JERSEY CONSERVATIVE PARTY), DEFENDANTS–RESPONDENTS, AND MR. GREGORY PASON, CANDIDATE FOR THE UNITED STATES SENATE (SOCIALIST PARTY), DEFENDANT.

Argued October 2, 2002—Decided October 2, 2002—Filed October 8, 2002.

*Angelo J. Genova,* argued the cause for appellants (*Genova, Burns & Vernoia,* attorneys).

*David Samson,* Attorney General of New Jersey, argued the cause *pro se* and for respondents Regena Thomas, Secretary of the State of New Jersey, and Ramon de la Cruz, Director of New Jersey Division of Elections.

*John M. Carbone,* argued the cause for respondents Hon. Michael J. Garvin, Clerk, County of Atlantic, Hon. Kathleen A. Donovan, Clerk, County of Bergen, Hon. Philip E. Haines, Clerk, County of Burlington, Hon. James Beach, Clerk, County of Camden, Hon. Angela F. Pulvino, Clerk, County of Cape May, Hon. Gloria Noto, Clerk, County of Cumberland, Hon. Patrick J. McNally, Clerk, County of Essex, Hon. James N. Hogan, Clerk, County of Gloucester, Hon. Janet E. Haynes, Clerk, County of Hudson, Hon. Dorothy K. Tirpok, Clerk, County of Hunterdon, Hon. Catherine DiCostanzo, Clerk, County of Mercer, Hon. Elaine M. Flynn, Clerk, County of Middlesex, Hon. M. Claire French, Clerk, County of Monmouth, Hon. Joan Bramhall, Clerk, County of Morris, Hon. M. Dean Haines, Clerk, County of Ocean, Hon. Ronni D. Nochimson, Clerk, County of Passaic, Hon. Gilda T. Gill, Clerk, County of Salem, Hon. R. Peter Widin, Clerk, County of Somerset, Hon. Erma Gormley, Clerk, County of Sussex, Hon. Joanne Rajoppi, Clerk, County of Union, Hon. Terrance D. Lee, Clerk, County of Warren (*Carbone and Faasse,* attorneys).

*Peter G. Sheridan* and *William E. Baroni, Jr.,* argued the cause for respondent Mr. Douglas Forrester (*Graham, Curtin & Sheridan* and *Blank Rome Comisky & McCauley,* attorneys; *Mr. Sheridan, Mr. Baroni, Dorothy A. Harbeck* and *Christopher J. Keale,* on the letter brief).

*Elizabeth Macron,* argued the cause *pro se.*

*Brian W. McAlindin,* argued the cause for respondent Mr. Norman E. Wahner (*Wilson, Elser, Moskowitz, Edelman & Dicker,* attorneys).

*Ted Glick,* argued the cause *pro se.*

*Evan H.C. Crook,* Burlington County Solicitor, submitted a letter in lieu of brief on behalf of respondent Hon. Philip E. Haines, Clerk, County of Burlington.

*Alfred B. Vuocolo, Jr.,* Mercer County Counsel, submitted a certification in lieu of brief on behalf of respondent Hon. Catherine DiCostanzo, Clerk, County of Mercer.

*Gil D. Messina,* Assistant Monmouth County Counsel, submitted a letter and certification in lieu of brief on behalf of respondent Hon. M. Claire French, Clerk, County of Monmouth (*Malcolm V. Carton,* Monmouth County Counsel, attorney).

*Ronald Kevitz,* Morris County Counsel, submitted a letter in lieu of brief on behalf of respondent Hon. Joan Bramhall, Clerk, County of Morris.

*Thomas C. Miller,* Somerset County Counsel, submitted a certification in lieu of brief on behalf of respondent Hon. R. Peter Widin, Clerk, County of Somerset.

The opinion of the Court was delivered by

PORITZ, C.J.

By order dated October 2, 2002, we granted relief permitting the New Jersey Democratic State Committee to select a candidate to replace Senator Robert G. Torricelli on the November 2002 ballot. We issued the Order without opinion because, in our view, "the interests of justice require[d] the immediate issuance of an Order disposition with the Court's opinion to follow in due course." *New Jersey Democratic Party v. Samson,* 175 *N.J.* 172, at 176, 814 *A.*2d 1027 (2002).

This opinion sets forth the basis for our disposition.

## I

On September 30, 2002, Senator Robert G. Torricelli announced his withdrawal as the New Jersey Democratic Party's candidate for the United States Senate in the November 5, 2002, general election. On October 1, 2002, the New Jersey Democratic Party, with other related plaintiffs [1] (generally plaintiffs), filed a Complaint in Lieu of Prerogative Writs and Order to Show Cause seeking temporary restraints in the Superior Court, Law Division, Middlesex County. Simultaneously, plaintiffs filed a Motion for Direct Certification with this Court pursuant to New Jersey Court *Rule* 2:12–1, which permits the Supreme Court, on its own motion, to certify any action or class of actions for direct appeal. As described in our subsequent Order of October 2, 2002, plaintiffs asked this Court for an injunction prohibiting Robert G. Torricelli's name from appearing on the November 5, 2002, general election ballot, declaring that the New Jersey Democratic State Committee (State Committee) may proceed to select a candidate to fill the vacancy created by Senator Torricelli's withdrawal, and permitting Senator Torricelli's name to be replaced on the general election ballot with the name of the candidate to be selected by the State Committee. *New Jersey Democratic Party, supra,* at 174–75, 814 *A*.2d 1026. Plaintiffs further requested that an order be issued directing the twenty-one county clerks to substitute the new candidate's name "on all ballots, whether absentee, military,

---

[1] The New Jersey Democratic Party, Inc.; the New Jersey Democratic State Committee, and Bonnie Watson Coleman, as Chair of the New Jersey Democratic Party and New Jersey Democratic State Committee; and John or Jane Doe, Democratic Party Candidate for the Office of United States Senator, State of New Jersey.

Defendants are David Samson, Attorney General, State of New Jersey; Regena Thomas, Secretary of State, State of New Jersey; Ramon de la Cruz, Director, New Jersey Division of Elections; the twenty-one County Clerks, in their official capacity, named individually; Douglas Forrester, Republican candidate; Ted Glick, Green Party candidate; Elizabeth Macron, Libertarian Party candidate; and Norman E. Wahner, New Jersey Conservative Party candidate.

provisional, emergency, voting machine, ballot card, or otherwise." *Id.* at 175, 814 *A.*2d 1027.

Also on October 1, 2002, the trial court issued an Order to Show Cause and stayed the printing of the ballots for the general election. Later that day, this Court directly certified the matter on its own motion and dismissed plaintiffs' application for direct certification as moot. At the same time, the Court declared moot the Order to Show Cause issued by the Law Division, and ordered that the stay of the printing of the ballots imposed by the lower court remain in effect until our further order. The parties were required to file supplemental briefs and the matter was set down for oral argument at 10:00 a.m. on October 2, 2002.

Subsequent to argument on October 2, 2002, the Court unanimously granted plaintiffs' application for the removal of Senator Torricelli's name from the ballot for the general election of November 5, 2002, and ordered that his name be replaced by the name of the candidate selected by the State Committee. *Id.* at 174–76, 814 *A.*2d 1026–27. The Court further required that the "preparation of revised ballots ... proceed forthwith under the direction of the Attorney General of New Jersey and the supervision of Superior Court Judge Linda R. Feinberg, A.J.S.C. (Mercer County), who [was] empowered ... to exercise statewide jurisdiction over the process." *Id.* at 176, 814 *A.*2d 1027. The parties were ordered to meet with Judge Feinberg on the following day, October 3, 2002, in order "to expedite the implementation of [the Court's] Order." *Id.* at 176, 814 *A.*2d 1027.

More specifically, the Court focused on military and overseas ballots and required that those ballots "be given precedence in preparation and mailing." *Id.* at 177, 814 *A.*2d 1027. "[A]ll of the costs related to the preparation and, when necessary, the mailing of revised ballots" were ordered to "be borne by plaintiffs and paid under the supervision of Judge Feinberg." *Id.* at 177, 814 *A.*2d 1028. To facilitate such payment, plaintiffs were further required to deposit "$800,000, or such other sum as Judge Feinberg may

find to be necessary and appropriate to meet the costs of implementing [the Court's] Order, said deposit to be made in full or in such installments as Judge Feinberg shall determine, beginning no later than Friday, October 4, 2002." *Id.* at 177, 814 *A.*2d 1028. The Attorney General was ordered to oversee the described election activities "pursuant to his authority as the chief election official of the State of New Jersey;" to "take all steps necessary to avoid voter confusion, including, but not limited to the preparation of an explanatory letter to all voters to whom a revised ballot [is] sent;" and to report to Judge Feinberg in respect of the Court's requirements. *Id.* at 177, 814 *A.*2d 1028. Finally, the Court ordered Judge Feinberg to set the schedule for mailing revised ballots in a manner "that assures that ballots can be completed and returned in time for the November 5, 2002, general election." *Id.* at 177, 814 *A.*2d 1028.

## II

### A

Fifty years ago, Chief Justice Vanderbilt restated the principles that guide our decision in this case:

> Election laws are to be liberally construed so as to effectuate their purpose. They should not be construed so as to deprive voters of their franchise or so as to render an election void for technical reasons.
>
> [*Kilmurray v. Gilfert,* 10 *N.J.* 435, 440–41, 91 *A.*2d 865 (1952) (citations omitted).]

The concept is simple. At its center is the voter, whose fundamental right to exercise the franchise infuses our election statutes with purpose and meaning.

It has not always been so. In 1965, Chief Justice Weintraub spoke eloquently of the gradual alteration of our understanding in respect of that right we now deem fundamental. Universal suffrage did not come early in our history, but today,

despite an impoverished beginning, the right to vote has taken its place among our great values. Indeed the fact that the voting franchise was hoarded so many years testifies to its exalted position in the real scheme of things. It is the citizen's sword and shield. "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders,* 376 *U.S.* 1, 17, 84 *S.Ct.* 526, 535, 11 *L.Ed.*2d 481, 492 (1964). It is the keystone of a truly democratic society.

[*Gangemi v. Rosengard,* 44 *N.J.* 166, 170, 207 *A.*2d 665 (1965).]

Those ideas now appear self-evident—as does a corollary principle also described by Chief Justice Weintraub:

[T]he right to vote would be empty indeed if it did not include the right of choice for whom to vote.... "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government."

[*Ibid.* (citations omitted) (quoting *Reynolds v. Sims,* 377 *U.S.* 533, 555, 84 *S.Ct.* 1362, 1378, 12 *L.Ed.*2d 506, 523 (1964)).]

The right of choice as integral to the franchise itself, unlike universal suffrage, is grounded in the core values of the democratic system established by the framers of our Federal Constitution when this country was founded. In *Powell v. McCormack,* 395 *U.S.* 486, 89 *S.Ct.* 1944, 23 *L.Ed.*2d 491 (1969),[2] the United States Supreme Court adverted to that history, stating:

A fundamental principle of our representative democracy is, in Hamilton's words, "that the people should choose whom they please to govern them." 2 Elliot's Debates 257. As Madison pointed out at the Convention, this principle is undermined as much by limiting whom the people can select as by limiting the franchise itself.

[*Id.,* 395 *U.S.* at 547, 89 *S.Ct.* at 1977, 23 *L.Ed.*2d at 531.]

## B

Those precepts have directly informed the decisions of this Court and of our lower courts interpreting New Jersey election law in a variety of factual contexts. In *Kilmurray v. Gilfert,*

---

[2] In *Powell, supra,* 395 *U.S.* at 549, 89 *S.Ct.* at 1979, 23 *L.Ed.*2d at 533, Representative Adam Clayton Powell (N.Y.) was not permitted to take his seat in the ninety-first Congress because, subsequent to his re-election, Congress passed a resolution excluding him from the House. The United States Supreme Court held that it was unlawful for Congress to exclude Powell on grounds other than the age, citizenship, and residency requirements of Article I, § 2 of the Federal Constitution.

*supra,* 10 *N.J.* at 441–42, 91 *A.*2d 865, for example, we permitted a substitute candidate to be placed on the ballot in lieu of a candidate who had died thirty-six days prior to the general election. At the time, the statute established the manner in which vacancies that occurred more than thirty-seven days prior to the election may be filled. *R.S.* 19:13–20 (current version at *N.J.S.A.* 19:13–20 (1985)). Because the candidate had died outside of the statutory window, plaintiffs argued that a new candidate could not be presented to the electorate even though the county committee was able to select the new candidate within the statutory time frame for such selection. *Ibid.* ("In the event of a vacancy, howsoever caused, . . . which vacancy shall occur not later than thirty-seven days before the general election, . . . a candidate shall be selected [by the party's county committee] . . . no later than thirty-four days prior to the general election." *Kilmurray, supra,* 10 *N.J.* at 438–39, 91 *A.*2d 865 (quoting now amended *R.S.* 19:13–20)). The Court deemed the thirty-seven day limitation to be directory and not mandatory, essentially holding that so long as the new candidate was selected by the committee within the thirty-four day period, that candidate had an absolute right to appear on the ballot. Most important, in *Kilmurray* the Court interpreted the time frames in the election laws "so as to effectuate [the statutory] purpose," *id.* at 441, 91 *A.*2d 865, stating,

It is in the public interest and the *general intent of the election laws* to preserve the two-party system and to submit to the electorate a ballot bearing the names of candidates of both major political parties as well as of all other qualifying parties and groups.

[*Kilmurray, supra,* 10 *N.J.* at 441, 91 *A.*2d 865 (emphasis added) (citation omitted); *see also Hand v. Larason,* 163 *N.J.Super.* 68, 75, 394 *A.*2d 163 (Law Div.1978) (holding that one candidate could not win primaries of both parties because "the public interest, as it is served by the multiparty political system, is a lodestar to the construction of Title 19").]

Subsequently, in *Wene v. Meyner,* 13 *N.J.* 185, 98 *A.*2d 573 (1953), the Court permitted votes to be counted in a gubernatorial primary election when the voter had neither " 'voted in a primary election of a political party for two subsequent annual primary elections' " nor " 'signed and filed with the district board a declaration designating the political party in whose primary [the voter]

desires to vote.'" *Id.* at 190–91, 98 *A.*2d 573 (quoting *R.S.* 19:23–45 (current version at *N.J.S.A.* 19:23–45)). Regarding the voters' technical noncompliance with the statute, the Court explained:

> A statute is not to be given an arbitrary construction, according to the strict letter, but rather one that will advance the sense and meaning fairly deducible from the context. The reason of the statute prevails over the literal sense of terms; the manifest policy is an implied limitation on the sense of the general terms, and a touchstone for the expansion of narrower terms. As said by Mr. Chief Justice Vanderbilt in *Kilmurray v. Gilfert* ...: "Election laws are to be liberally construed, so as to effectuate their purpose. They should not be construed so as to deprive voters of their franchise or so as to render an election void for technical reasons."
>
> [*Id.* at 197, 98 *A.*2d 573 (citations omitted); *see also Clemency v. Beech,* 306 *N.J.Super.* 244, 248, 703 *A.*2d 399 (1997) (allowing candidate's name to appear on ballot despite late filing of required documents).]

In *Gangemi, supra,* 44 *N.J.* at 174, 207 *A.*2d 665, the Court struck down a statutory residency requirement for elective office that affected only two municipalities in the State. Although the case did not involve questions of statutory interpretation, Chief Justice Weintraub discussed in some detail "the right of choice for whom to vote." *Id.* at 170, 207 *A.*2d 665. In the context of a limitation "upon eligibility for elective office," he observed that "the restraint is on the right to vote as well." *Ibid.* Ultimately, the Court found the residency requirement to be constitutionally infirm. *Id.* at 173–74, 207 *A.*2d 665. To the extent that alternative interpretations of the election laws are possible, *Gangemi* teaches that limitations on the right of voter choice in some circumstances will override other considerations.

Twenty-five years later, in *Catania v. Haberle,* 123 *N.J.* 438, 588 *A.*2d 374 (1991), the Court again considered a statutory provision that governed the filling of a vacancy on the ballot and the substitution of one candidate for another. There, no Republican had won sufficient votes in the primary election so the Republican County Committees selected a candidate to run in a special election for the New Jersey Assembly. Notice of the Committees' meeting to fill the vacancy was not given within seven days of the primary as required by *N.J.S.A.* 19:13–20(b)(1), with the result that the Secretary of State refused to accept the Committees'

candidate. Chief Justice Wilentz began his analysis with the principle set down in *Kilmurray:*

> The general rule applied to the interpretation of our election laws is that absent some public interest sufficiently strong to permit the conclusion that the Legislature intended strict enforcement, statutes providing requirements for a candidate's name to appear on the ballot will not be construed so as to deprive the voters of the opportunity to make a choice.
>
> [*Catania, supra,* 123 *N.J.* at 442–43, 588 *A.2d* 374 (citing *Kilmurray, supra,* 10 *N.J.* at 440–41, 91 *A.2d* 865); *see also Fulbrook v. Reynolds,* 304 *N.J.Super.* 125, 133, 698 *A.2d* 564 (Law Div.1997) (allowing replacement candidate for city council to further voters' choice of candidates).]

Anticipating that other cases would follow in which this Court would have to make similar judgment calls in respect of similar statutory provisions, the Chief Justice continued:

> Concerns have been expressed that by giving this deadline provision a directory, rather than mandatory, construction we will create doubts about many other sections of the election law, a law that is driven by deadlines. Our only response is that this Court has traditionally given a liberal interpretation to that law, "liberal" in the sense of construing it to allow the greatest scope for public participation in the electoral process, to allow candidates to get on the ballot, to allow parties to put their candidates on the ballot, and most importantly to allow the voters a choice on Election Day. Obviously, there will be cases in which provisions must be interpreted strictly, mandatorily, for in some cases it will be apparent that that interpretation serves important state interests, including orderly electoral processes. But those cases must be decided on their own facts, under the law involved. This Court has never announced that time limitations in election statutes should be construed to bar candidates from the ballot when that makes no sense and when it is obviously not the Legislature's intent. There are states that have such rules, but New Jersey is not one of them.
>
> [*Catania, supra,* 123 *N.J.* at 448, 588 *A.2d* 374 (citations omitted).]

 When this Court has before it a case concerning the New Jersey election laws, we are directed by principle and precedent to construe those laws so as to preserve the paramount right of the voters to exercise the franchise. We have understood our Legislature, in establishing the mechanisms by which elections are conducted in this State, to intend that the law will be interpreted "to allow the greatest scope for public participation in the electoral process, to allow candidates to get on the ballot, to allow parties to put their candidates on the ballot, and most importantly to allow the voters a choice on Election Day." *Ibid.*

## III

### A

In this case, Senator Torricelli has withdrawn his name as the Democratic Party's candidate for the United States Senate after having won his place on the ballot in the primary election. In respect of candidates nominated through the primary system, *N.J.S.A.* 19:13–20 states,

> In the event of a vacancy, howsoever caused, among candidates nominated at primaries, which vacancy shall occur not later than the 51st day before the general election, or in the event of inability to select a candidate because of a tie vote at such primary, a candidate shall be selected in the following manner:
>
> a. (1) In the case of an office to be filled by the voters of the entire State, the candidate shall be selected by the State committee of the political party wherein such vacancy has occurred.
>
> . . . .
>
> d. A selection made pursuant to this section shall be made not later than the 48th day preceding the date of the general election, and a statement of such selection shall be filed with the Secretary of State. . . .

By its terms, Section 20 establishes an absolute right in a State committee to replace a candidate up to and including the forty-eighth day before the general election.[3] Here, we confront a vacancy created outside of the statutory window. Nothing in *N.J.S.A.* 19:13–20 addresses the precise question whether a vacancy that occurs between the forty-eighth day and the general election can, in that circumstance, be filled.

### B

We observe first that other states have explicitly dealt with the consequences when a vacancy occurs outside of that window. By

---

[3] In *Kilmurray, supra,* 10 *N.J.* at 439, 91 *A.2d* 865, the Court concluded that the predecessor statute (*R.S.* 19:13–20), wherein the statutory time frames were set at thirty-seven and thirty-four days rather than fifty-one and forty-eight days, was directory in respect of the thirty-seven day withdrawal period. Then, a State committee had an absolute right to replace a candidate up to and including the thirty-fourth day; under the amended statute the operative date is forty-eight days.

way of example, the New York analogue to New Jersey's Section 20 states that "[t]he failure to file any petition or certificate relating to the designation or nomination of a candidate for party position or public office or to the acceptance or declination of such designation or nomination within the time prescribed by the provisions of this chapter shall be a *fatal defect.*" N.Y. Elec. Law § 1–106(2) (McKinney 1998) (emphasis added). Another example may be found in the Colorado statute, where the Legislature has declared that ˙

> [a]ny vacancy in a party nomination occurring less than eighteen days before the general election that is caused by the declination, death, disqualification, or withdrawal of any person nominated at the primary election ... shall not be filled before the general election. In such case, the votes cast for the [withdrawn] candidate ... are to be counted and recorded, and, if the candidate receives a plurality of the votes cast, such vacancy shall be filled ... by the respective party vacancy committee....
>
> [Colo.Rev.Stat. Ann. § 1–4–1002 (West 2002).]

In Washington, the Legislature has similarly declared that when a

> vacancy occur[s] after the sixth Tuesday prior to [the] state primary or general election and time does not exist in which to correct ballots (including absentee ballots), ... then the votes cast or recorded for the person who has died or become disqualified shall be counted for the person who has been named to fill such vacancy.
>
> [Wash. Rev.Code Ann. § 29.18.160 (West 2002).4]

That other state legislatures have spoken clearly on this question [5] highlights the lack of a legislative declaration in the New Jersey

---

[4] Such vacancies are filled by the state central committee of the appropriate political party.

[5] Statutes in many jurisdictions are instructive. Some states set few or no restrictions on the replacement of a candidate before the general election. In Alabama, Kansas and Pennsylvania, for example, a party committee may replace a candidate anytime prior to the general election. Ala.Code § 17–16–41 (2002); Kan. Stat. Ann. § 25–3905; Pa. Stat. Ann. tit. 25, § 2939 (West 2002). Arkansas allows the party committee to fill a vacancy caused by death, illness or relocation, requiring only that the party, within five days of the vacancy, notify the Governor whether the candidate will be replaced by special election or convention. Ark.Code Ann. § 7–7–104 (Michie 2001). In Michigan, if a candidate dies or withdraws, then a state central committee shall meet "forthwith" and select a replacement candidate. Mich. Comp. Laws Ann. §§ 168.98–.99 (West 2002).

statute. How the New Jersey Legislature would intend the issue to be resolved is the crux of this case.

## C

Defendants ask the Court to interpret Section 20 as rendering unlawful *per se* the filling of a vacancy within fifty-one days of the election. On Election Day, defendants argue, the voters must choose between other candidates and a Democratic Party candidate whose name must remain on the ballot even though he has withdrawn, and even though our statute does not specifically require that his name not be removed. If the voters then choose to elect that candidate, the Governor can "make a temporary appointment ... until a special election or general election shall have been held" pursuant to *N.J.S.A.* 19:3–26. Plaintiffs contend that the time frame specified in Section 20 was meant to "afford the various election officials sufficient time in which to attend to the mechanics of preparing for the general election." *Kilmurray, supra*, 10 *N.J.* at 440, 91 *A.2d* 865. The provision was not enacted, plaintiffs argue, to usurp a fundamental principle of democracy, but must be interpreted so as to afford the voter a real choice among candidates representing a full spectrum of political ideologies. Plaintiffs assert that, in furtherance of that principle, they must be permitted to fill this vacancy forthwith.

In essence, the parties extrapolate contrary views from the language of Section 20 concerning what the Legislature must have intended when a vacancy occurs outside the statutory time frame. We think plaintiffs have the better argument. *N.J.S.A.* 19:13–20 simply does not contain a legislative declaration that the filling of a vacancy within forty-eight days of the election is prohibited. Unlike the legislatures of our sister states that have clearly expressed the consequences that follow when a vacancy

---

Under the Minnesota statute, a candidate can withdraw sixteen days prior to the general election and be replaced within fourteen days of the election. Replacement is permitted within four days of the election if the candidate has a catastrophic illness or dies. Minn.Stat. Ann. §§ 204B.12–.13 (West 2002).

occurs outside of the statutory period, New Jersey has not specifically addressed the issue. When that happens, the Court must consider the "fundamental purpose" of the enactment, and, where it "does not expressly address a specific situation ... interpret it [in a manner] consonant with the probable intent of the draftsman had he anticipated the matter at hand." *State, Township of Pennsauken v. Schad,* 160 *N.J.* 156, 170, 733 *A.*2d 1159 (1999) (citations and internal quotations omitted); *see also Hubbard ex rel. Hubbard v. Reed,* 168 *N.J.* 387, 396, 774 *A.*2d 495 (2001) (finding that affidavit of merit statute was silent regarding affidavit requirement in common knowledge malpractice cases); *AMN, Inc. v. Township of So. Brunswick Rent Leveling Bd.,* 93 *N.J.* 518, 524–25, 461 *A.*2d 1138 (1983) (finding that drafters of local ordinance did not contemplate question whether condominium owners would be subject to rent control). It falls, then, to the Court to determine the "essential purpose and design" of the election law so as to effectuate the legislative purpose. *Aponte–Correa v. Allstate Ins. Co.,* 162 *N.J.* 318, 323, 744 *A.*2d 175 (2000).

## D

We do not believe that our Legislature intended to limit voters' choice in a case where there is sufficient time to place a new candidate on the ballot *and* conduct the election in an orderly manner. There is no question but that the "full and free expression of the popular will," *Sharrock v. Keansburg,* 15 *N.J.Super.* 11, 17, 83 *A.*2d 11 (App.Div.1951), is furthered by allowing the substitution of a new candidate for the United States Senate chosen by the State Committee. There is also no question but that the Legislature enacted *N.J.S.A.* 19:13–20 "to afford the various election officials sufficient time in which to attend to the mechanics of preparing for the general election." *Kilmurray, supra,* 10 *N.J.* at 440, 91 *A.*2d 865. Further, according to the Assembly Committee Statement to the 1985 amendments extending the time frames in the statute, the extension was designed to permit "absentee voters, particularly military and civilian voters dwelling abroad,

sufficient time to apply for, receive, execute and return their ballots." Assembly State Gov't., Civil Serv., Elections, Pensions and Veterans Affairs Comm., *Statement to Senate Bill No.* 2244 (1985). Based on those concerns, the Attorney General has argued that this Court must consider "whether the dual interests of full voter choice and an orderly administration of the election can be effectuated if the requested relief were to be granted." We concur in that approach because it reconciles apparently conflicting goals in a practical manner.

What must be assessed is the actual impact on the administration of the election of allowing the substitution at this point in time; the cost and feasibility of printing and, when necessary, mailing new ballots; and, more particularly, the effect of carrying out those activities on overseas civilian and military absentee ballots. At bottom, if on the record before us it is administratively feasible to replace Senator Torricelli's name on the ballot, the general statutory intent and underlying purpose of the election laws to enable voters to exercise the franchise and to choose from among various candidates is furthered.[6] If that is not what the Legislature intended, we anticipate that it will amend Section 20 accordingly.

## E

On the record before the Court, and with due regard to the representations of the Attorney General and counsel for the county clerks at oral argument, we find that there is sufficient

---

[6] We observe that the Legislature is presumed to be aware of judicial construction of its enactments. *Brewer v. Porch*, 53 *N.J.* 167, 174, 249 A.2d 388 (1969). Our cases repeatedly have construed the election laws liberally, consonant with their purpose and with practical considerations related ·to process. We are aware of only one instance in which the Legislature amended an election provision to prevent the filling of a vacancy, effectively overriding the decision of this Court in *Fields v. Hoffman*, 105 *N.J.* 262, 520 A.2d 751 (1987). *See Catania, supra*, 123 *N.J.* at 444, 588 A.2d 374 (declining to apply the amended statute retroactively).

time before the general election to place a new candidate's name on the ballot. In respect of absentee voters, particularly military and civilian New Jersey citizens dwelling abroad, we are informed that of approximately 19,000 absentee ballots authorized as of October 2, 2002, some 1,700 had been mailed and few had been returned. We are also informed that if the printing of new absentee ballots was expedited, most could be prepared and mailed within five business days. We understand that express mailing, both outgoing and return,[7] is available to and from most overseas locations, and that if a source of funding for those activities is available, they can be carried out expeditiously.

Convinced that the absentee ballots can be handled in a manner that will not disenfranchise absentee voters, we required by order that the Attorney General oversee those election activities, "including, but not limited to, the preparation of an explanatory letter to all voters to whom a revised ballot has been sent." *New Jersey Democratic Party, supra* at 177, 814 *A*.2d 1027. We empowered Superior Court Judge Linda R. Feinberg to exercise statewide jurisdiction in this matter, and to supervise and control the process. *Id.* at 176, 814 *A*.2d 1027. We ordered military and civilian absentee ballots to be given first priority in preparation and mailing and required plaintiffs to bear the costs of implementing the necessary election activities, including the preparation and mailing of revised ballots. *Id.* at 177, 814 *A*.2d 1028. Finally, we ordered that the schedule for the mailing of revised ballots "shall be set by Judge Feinberg in a manner that assures that ballots can be completed and returned in time for the November 5, 2002 general election." *Id.* at 177, 814 *A*.2d 1028.

We are satisfied that the process we have put in place will be orderly and expeditious and that all voters will be able to cast

---

[7] In New Jersey, votes can be returned by fax pursuant to *N.J.S.A.* 19:59–14.

their ballots for a candidate of their choice in the general election of November 2002.

## IV

Some further comment is warranted in respect of certain arguments presented to the Court by the parties.

Defendants believe that the interpretation of *N.J.S.A.* 19:13–20 we have adopted will cause electoral chaos because any candidate who fears losing at the polls can withdraw thereby allowing someone else to run instead.[8] But candidates who choose to withdraw are free under the present scheme to do so for any reason, thus entitling their political parties to replace them on the ballot with impunity up to forty-eight days before the election. We assume that it is difficult for any party, logistically, politically, and financially, to replace a candidate closer to an election. That is not to suggest it cannot happen; it has in this case. However, defendants have not presented any evidence indicating that a rush of withdrawals has occurred in states that allow substitutions close to the election. Most important, if the Legislature credits defen-

---

[8] Defendants Forrester and Wahner conceded during oral argument that certain exceptions must be read into Section 20 to take into account the death or physical disability of a candidate within forty-eight days of the election. In those circumstances, they would eschew an interpretation of the statute that would deprive the voters of a choice on Election Day. Their disagreement with plaintiffs is not *whether* the statute permits a new candidate to enter the field within the forty-eight day period before election, but under what circumstances the candidate is permitted to do so. Unlike statutes in other jurisdictions, our statute does not distinguish acceptable reasons from unacceptable reasons for withdrawal as is the case in some other states. *See, e.g.,* S.C.Code Ann. § 7–11–50, –55, (Law.Co-op. 2001) and Miss.Code Ann. § 23–15–317 (2001) (permitting replacement of vacancy if candidate resigned for "legitimate nonpolitical reason," including "condition which, ... would be harmful to the health of the candidate if he continued," "family crises," and "[s]ubstantial business conflict"); Minn. Stat. Ann. §§ 204B.12–.13 (West 2001) (establishing deadline for replacement of withdrawn candidate sixteen days before general election, but permitting replacement no later than four days if, after deadline, candidate is diagnosed with "catastrophic illness," which will "permanently and continuously incapacitate the candidate and prevent ... perform[ance of candidate's] duties....").

dants' "parade of horribles" all it need do, as we noted earlier, is amend the statute expressly to preclude or otherwise condition ballot substitutions after the forty-eighth day.

■ Representatives of the Libertarian, Conservative, and Green parties argue that the existing third-party candidates offer voters a full choice, obviating the need for plaintiffs' requested remedy. Although the participation of third-party candidates supports a robust democracy, we recognize the present reality of the two-party system as an organizing principle of the political process in this country. *Cf.* Gerald Leonard, *Party as a "Political Safeguard of Federalism": Martin Van Buren and the Constitutional Theory of Party Politics,* 54 *Rutgers L.Rev.* 221, 227 (2001) (tracing rise of political parties since beginning of our republic and observing that "two-party system ... now constitutes the main political safeguard of federalism").

Title 19 reflects the significant role of the two parties in the electoral system. *N.J.S.A.* 19:44A–10.1 authorizes the leaders of the majority and minority parties in both houses of the Legislature to establish committees to receive contributions and to make expenditures to promote candidates and the passage or defeat of public questions. Indeed, this Court has long accepted that, whatever their shortcomings, "elections take place ... in the context of a partisan, party-based political system." *Friends of Governor Tom Kean v. New Jersey Election Law Enforcement Comm'n.,* 114 *N.J.* 33, 35, 552 *A.*2d 612 (1989). Stated differently, vigorous elections under our present system require the participation of the two major parties. That reality affects the meaning of voter choice within the framework of the statute. Moreover, plaintiffs' remedy does not preclude voters from casting ballots in favor of the Republican candidate already on the ballot, or, as they choose, any one of the third-party candidates seeking election to the United States Senate in the November election. In that regard, our disposition preserves the ability of qualified candidates of all parties to seek and obtain that office consistent with statutory and decisional law.

■ Finally, defendant Forrester asserts that the federal voting rights of overseas military and civilian absentee ballot voters guaranteed by The Uniformed and Overseas Citizens Absentee Voting Act, 18 *U.S.C.* §§ 608–609 (2002), 39 *U.S.C.* § 3406 (2002), 42 *U.S.C.* § 1973 (2002), will be violated if we grant the relief sought by plaintiffs. Believing that substantial numbers of overseas ballots already may have been mailed, defendant Forrester claims that military and civilian absentee voters may be disenfranchised by the late mailing of new ballots.

The short answer to defendant's concern is that the expeditious handling of amended absentee ballots will assure that the voters who use those ballots will have their votes counted in the general election. If Judge Feinberg concludes at some point that it is necessary to extend the time for certifying the election to allow absentee ballots to be tabulated, that remedy is also available. *See Harris v. Florida Elections Canvassing Comm'n,* 122 *F.Supp.*2d 1317, 1325 (N.D.Fla.2000) (holding ten-day extension allowing State to count overseas absentee ballots in federal elections to be valid); *see also United States v. Wisconsin,* 771 *F.*2d 244, 245 (1985) (upholding district court order requiring election officials to count certain late-arriving ballots).

## V

We have been asked to determine whether a vacancy created by the withdrawal of a major party candidate for the United States Senate may be filled by the State Committee thirty-four days before the election. In the absence of explicit direction from the Legislature, we have construed the relevant statutory provision, *N.J.S.A.* 19:13–20, to promote the goals underlying our election laws—to ensure an opportunity for voters to exercise their right of choice in the November 2002 senatorial election consonant with an orderly process for the handling of ballots. Our decision is rooted in the statute and our prior precedents interpreting its provisions, and is informed by the knowledge that the substitution of a

candidate at this time will not affect adversely the right of any qualified voter to participate in the election.

For the foregoing reasons, the Court grants the relief as set forth in our Order of October 2, 2002.

*For granting*—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, LaVECCHIA, ZAZZALI and ALBIN—7.

*Opposed*—None.