**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5454-18

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

ZAKRY S. SHIVERS,

      Defendant-Appellant.

_____

Argued February 28, 2022 – Decided March 15, 2022

Before Judges Fasciale and Vernoia.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 18-03-0474.

Austin J. Howard, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Candace Caruthers, Assistant Deputy Public Defender, of counsel and on the brief).

William Kyle Meighan, Supervising Assistant Prosecutor, argued the cause for respondent (Bradley D. Billhimer, Ocean County Prosecutor, attorney; Samuel Marzarella, Chief Appellant Attorney, of counsel; William Kyle Meighan, on the brief).

PER CURIAM

Defendant Zakry S. Shivers pleaded guilty to first-degree robbery and the court imposed a ten-year sentence subject to the requirements of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. He appeals from his conviction and sentence, arguing the court erred by denying his motion to suppress physical evidence and by failing to sentence him to a term appropriate for a crime one degree lower than the first-degree offense to which he pleaded. He also claims he is entitled to resentencing for retroactive application of mitigating factor fourteen, that he was under twenty-six years of age at the time the crime was committed, N.J.S.A. 2C:44-1(b)(14). Unpersuaded by defendant's arguments, we affirm.

I.

Following his indictment for robbery, aggravated assault, and weapons offenses, defendant moved to suppress evidence seized from his person and a backpack he carried following his arrest. The evidence at the hearing on defendant's motion established that at around 5:00 p.m. on October 13, 2017, Brick Township police officers were informed there had been a robbery at a local gas station. Patrolman Mark Storch testified he first learned about the

robbery at "[r]oughly around 5:15" p.m. and was informed a male suspect with a knife had "fled the scene."

Storch drove his marked patrol car to the vicinity of the gas station to look for a potential suspect, and, about five minutes after first learning about the robbery, he traveled down a dead-end, residential street located about a half-mile from the station. Storch noticed a male, later identified as defendant, walking on the sidewalk in the same direction Storch was traveling.

Storch followed defendant but stayed about fifteen yards behind him. According to Storch, he "constantly" braked the patrol car to stay behind defendant. The brakes of the patrol car "were constantly squeaking at the time, to the point where other" people "in the neighborhood were looking at the car," but Storch noticed defendant "never looked over his shoulder once to see what type [of vehicle] or who was behind him with the brakes."

Storch received a further description of the suspect over the radio. It was reported the suspect was "a black male approximately six feet tall." Storch noted the individual he was following was about six feet tall. Storch drove the patrol car nearer to defendant and identified him as a black male.

Storch then drove his patrol car, with the driver's side window down, alongside defendant as he continued to walk on the sidewalk. Storch asked

3

defendant where he was going, and defendant said he was going home. When Storch asked defendant where he lived, defendant first said "down the block." Storch again asked defendant where he lived, and defendant said he was going to his girlfriend's house and provided the name of a street where his girlfriend purportedly lived. When Storch told defendant he could not get to that street from where he was, defendant said he planned to take a trail behind a convenience store that led to the street.

Storch testified the street defendant identified as the location of his girlfriend's home was not accessible either by the road defendant was on or by any sidewalk. Storch also explained the trail behind the convenience store defendant mentioned was a mile and a half away and was not accessible from the neighborhood defendant was in.

At that point, Storch exited his patrol car, spoke to defendant "face-to-face," and asked defendant his name. Defendant provided his name and accused Storch of "racially profiling him." Storch explained he was speaking to defendant because "there was an incident" at the gas station, "the subject who committed [the] crime was a six-foot black male and [defendant] match[ed] the physical descriptions," and defendant was in "close proximity" to the robbery.

4

As Storch spoke to defendant, he observed defendant "was extremely nervous," "continually looked around," and "exhibit[ed] a fight or flight appearance."

Brick Township Patrolman Mancini, Detective Alvarado, and Detective Sergeant Lawrence Petrola arrived and joined in the conversation with defendant.[1]  According to Storch, Detective Joseph Leskowski also arrived at some point, spoke with defendant, left the scene, and returned later.  Storch testified defendant repeatedly asked if he could leave but was told he could not because "there was just a robbery," "[and] he matched the physical descriptions of" the suspect.  Storch recalled that it "was cool but not freezing cold," and defendant had "perspiration on his forehead and the sweatshirt[] he was wearing had actual sweat stains, moisture, on it."

According to Storch, the officers wanted him to sit because they "believed he might run" and the officers wanted to "try and keep him."  The officers "sat [defendant] on the curb."[2]  Storch explained that once defendant was seated on

---

[1]  Patrolman Mancini's and Detective Alvarado's first names are not included in the record.

[2]  Storch testified that he and Mancini "asked [defendant] to sit down because of his – it looks – his nervousness to run."  Storch also testified he told defendant "to relax and sit on the curb."

5

the curb, he was not free to leave, and he would have been directed to sit down if he had gotten up.

After defendant sat on the curb, Storch saw ants on the backpack defendant wore. Storch asked defendant to stand and noticed ants were not on his person; they were on the backpack only. When Storch pointed that out, defendant dropped the backpack from his back.

Storch further testified defendant asked many times if he could leave, and "out of frustration" he told defendant, "if you want to leave you can voluntarily show us your backpack, and if there's no elements of a crime in there, then you can go." In response, defendant did nothing.

Storch explained defendant "sat there" on the curb and subsequently asked again if he could leave, and that defendant had a conversation with Petrola about the backpack. Following his conversation with Petrola, defendant quickly opened a compartment in the backpack for a few seconds, and Storch looked inside and saw a "black hat." Storch testified his observation of the "black ball cap" was significant because it had been reported the perpetrator of the robbery

6

was wearing a black ball cap.[3]  Storch also testified defendant quickly closed the backpack and asked again if he could leave.

Storch took no further action, but later placed defendant under arrest after receiving an order to do so from Detective Leskowski.  Following defendant's arrest, Storch searched the backpack and found the hat and money from the robbery of the gas station in separate compartments.

Petrola also testified at the suppression hearing.  On October 13, 2017, he received a report about the gas station robbery during which the perpetrator used a "sharp object" to wound the victim before leaving the scene.  According to Petrola, the initial description of the suspect was a black male with a baseball cap who left the scene running east in the direction of the street where Storch observed defendant walking.  Petrola responded to the area to assist in locating the suspect and went to Storch's location to provide assistance.  Upon his arrival, Petrola learned Storch was with defendant who fit the suspect's description, defendant was unfamiliar with the area, and defendant was in close proximity to the location of the robbery.

---

[3]  Storch testified he could not recall when he was advised the perpetrator wore a black ball cap, and he said he did not remember if he learned that information before or after defendant's arrest.  As we explain, however, Petrola testified the initial dispatch report concerning the robbery stated the suspect wore a black baseball hat.

A-5454-18

Petrola also observed defendant seated on the curb, and Petrola noticed it was a "mild day" and defendant "was sweating." Defendant asked why he was being held and if he could leave. Petrola told defendant he was a suspect in a robbery, he fit the description of the suspect, and once they could establish he was not the suspect, "he would be free to leave."

Petrola also asked Storch if he "went through the backpack," and Storch said he had not because defendant did not consent to a search of it. Defendant asked Petrola "how [he] can get to leave," and Petrola said defendant was a suspect and he was waiting for a detective to arrive at the scene. Defendant asked "how long is it going to be," and Petrola explained the officers needed to determine whether defendant continued to be suspect, and that defendant could "help out" in that effort by consenting to a search. In response, defendant refused any search.

Petrola testified he then spoke to Leskowski, who was "going to be in charge of handling the . . . case," to inform him of "what was going on." Petrola explained after several minutes, defendant asked how he could "speed this up." Petrola told defendant he could "consent to the search and he has the right to refuse the search or stop the search." Petrola also told defendant he "did not have to consent to the search." Defendant asked if he could leave if he showed

A-5454-18

the officers his backpack, and Petrola told defendant "if he was no longer a suspect, then he [could] leave."

As Petrola spoke to Storch and Alvarado, defendant said he "want[ed] to speed this up so [he could] get out of here." Petrola testified he said, "okay," and defendant said he would show "what's in [his] bag." Petrola told defendant he did not have to show what was in the backpack, and that he could stop the search at any time. Defendant replied, "I'll show you," and opened the backpack, for less than five seconds, as Storch looked inside. Defendant shut the backpack and told Petrola, "you told me I could stop." Defendant asked if he could leave, but was told by Petrola he could not leave because the officers did not see what was in the backpack. Defendant said he did not "want to show [Petrola] anymore," and that he would wait for the detective to arrive.

Storch told Petrola he saw a baseball cap in the backpack. That information was significant to Petrola because of the prior report that the suspect wore a baseball cap.

Leskowski was the State's final witness at the suppression hearing. He testified he is a twenty-five-year veteran of the Brick Police Department, and recalled that on October 13, 2017 he received a report about the gas station robbery. He traveled directly to the street where Storch was with defendant

9

because he was informed Storch was with a possible suspect. When he arrived, Storch, Petrola, and Alvarado were present with defendant seated on the curb.

Upon his arrival, Leskowski was informed defendant had opened his backpack, and Storch reported seeing a "baseball-style cap similar to the one that was broadcast [in] the description" of the suspect. Leskowski approached defendant, asked "where he was, and where he was coming from," and defendant became "a little irate." After defendant denied any knowledge of the robbery, Leskowski left and went to the gas station to review video, photos, or anything else that had been obtained by the officers present there.

The victim was not at the gas station because he had been transported to the hospital. Other officers at the gas station directed Leskowski to a female, who reported she saw the robbery. The witness said she was confident she could identify the suspect if she saw him again. Another officer then drove the witness to the location where defendant was seated on the curb, and the witness said she was ninety-five percent sure defendant was the perpetrator, but his clothes were different.

While Leskowski spoke with the witness at the gas station, he received a report that a homeowner reported seeing someone changing clothes in the woods

A-5454-18

near his home. The homeowner also reported the individual left clothes in the woods.

After the female witness identified defendant as the perpetrator of the robbery, Leskowski met with the homeowner, who reported he had seen a black male changing clothes in the woods near his home. The homeowner made a comment to the man, who said he was going to the bathroom. The homeowner described the clothes the man wore after he dressed.

Leskowski called Petrola and asked that he take a picture of defendant and send it.[4] Petrola took a picture of defendant seated on the curb and sent it to Leskowski, who showed it to the homeowner. The homeowner immediately identified defendant as the individual he had seen changing his clothes. Leskowski returned to defendant's location and ordered that he be placed under arrest.

Leskowski explained that around 5:20 p.m. he headed to the location where defendant was located with Storch and the other officers. According to

---

[4] In its decision on defendant's suppression motion, the court noted Petrola testified Leskowski requested that he take a photo of defendant before defendant opened his backpack and Storch looked inside. The court, however, found Leskowski's version of the sequence of events more credible, and the court concluded Leskowski did not request that Petrola take the photo of defendant until after defendant opened the backpack and the witness to the robbery went to defendant's location on the curb and identified him as the perpetrator.

Leskowski, by that time he arrived at defendant's location, defendant had opened the backpack and Storch had seen the baseball cap.

Leskowski also testified that after briefly speaking with the other officers and defendant, over the following fifteen minutes he went to the gas station and returned to defendant's location where the female witness reported she was ninety-five percent certain defendant was the perpetrator.

Leskowski then left defendant's location again, traveled to meet the homeowner, and requested and received the picture from Petrola that the homeowner used to identify defendant. Leskowski explained he then returned to defendant's location and ordered that he be placed under arrest. Leskowski estimated that from the time he first left defendant's location until he returned and ordered defendant be placed under arrest, about an hour had passed.

After hearing argument from counsel, the court rendered a decision from the bench, first finding Leskowski "extremely candid and credible," Petrola "very credible," and Storch's testimony, although at times argumentative, included information necessary to the court's analysis of the issues.

The court found Storch's initial interaction and questioning of defendant constituted a field inquiry. The court determined Storch was in close proximity

to where a serious crime — a first-degree robbery — had been committed, and he arrived in the area within a short time after the commission of the crime.

The court also found Storch initially followed defendant, but did not impede defendant in any manner as he trailed behind him. The court further found Storch initially could only determine defendant was a male who was around six feet tall, and as Storch slowly followed defendant, he kept applying the brakes so as not to catch up with the "walking suspect." The court noted that others in the neighborhood looked at the patrol car when Storch applied the brakes, but defendant never turned around to look. The court explained that although defendant's failure to react to Storch's squeaking brakes was innocent conduct by itself, it could be properly considered in the totality of the circumstances in determining the validity of the officer's actions.

The court also found Storch had a conversation with defendant as he drove alongside defendant. The court found the conversation constituted a field inquiry during which Storch asked defendant where he was going, and defendant said he was going home. When Storch asked defendant for his address, defendant provided a response that contradicted his prior statement, saying he was going to his girlfriend's house. The court determined Storch then asked

13

defendant for his girlfriend's address and defendant provided the name of a street, and Storch noted "you can't get there from here."

The court further found defendant accused Storch of racial profiling as Storch initially questioned him. The court observed racial profiling is unlawful, but it found no basis to conclude Storch's interaction with defendant constituted racial profiling. The court determined Storch had received a report that a black male about six-feet tall had committed the robbery, Storch started following defendant before determining he was black, and defendant fit the suspect's description and was seen in close proximity to the crime. The court concluded Storch's initial field inquiry with defendant was not improper.[5]

The court further found the field inquiry continued after Storch exited the patrol car and walked alongside defendant while speaking with him. During that time, Storch observed that defendant was extremely nervous, and his eyes were darting about in a manner suggesting to Storch defendant was considering whether to flee. While still talking to defendant, but without obstructing his

---

[5] The court also found as fact that Storch's testimony defendant "did not belong in the neighborhood" was not founded on defendant's race but instead was a based solely on defendant's inconsistent and incredible responses to Storch's questions about where he was going, where he lived, and where his girlfriend purportedly lived.

14

movement in any way, Storch also observed defendant was sweating profusely on a cool October evening.

The court determined Storch then directed defendant to sit on the curb and, at that point, the field inquiry became an investigative detention under Terry v. Ohio, 392 U.S. 1 (1968). The court found there was reasonable and articulable suspicion for the Terry stop because defendant was in close proximity to the crime soon after it was committed, defendant fit the description of the suspect, defendant provided inconsistent and incredible answers to Storch's questions about where he lived and where he was going, and defendant exhibited signs of nervousness — sweating and darting eyes.

The court addressed the search of the backpack that resulted from Storch's look inside it. The court found defendant asked if he could leave, and Petrola properly informed defendant he could leave if he consented to a search of his backpack and the search confirmed defendant should not be a suspect. The court also found Petrola fully informed defendant on three separate occasions he did not have to consent to a search, he could refuse consent, and, if he consented, he could stop the search at any time. The court determined defendant knew he had the right to refuse to consent because he exercised that right a number of times. The court also found defendant later voluntarily picked up the backpack

15

and opened one of its compartments for a few seconds to allow Storch to look inside. For those reasons, the court found the search of the backpack was lawful.

The court accepted Petrola's testimony Storch said he saw the ballcap in the backpack, and the hat was significant because, as Leskowski testified, the initial report of the robbery described the suspect as wearing a baseball cap. The court further found Storch's observation of the hat provided an additional basis for a reasonable and articulable suspicion defendant had committed the robbery that warranted his continued detention.

The court also found Storch's testimony about seeing the ants on the backpack credible. It accepted Petrola's testimony that the presence of the ants on the backpack, and the absence of them on defendant, supported a suspicion the backpack had been stored somewhere separate from defendant, to perhaps secrete a change of clothes, a weapon, or the proceeds after the robbery.

The court relied on Leskowski's testimony that after he arrived at defendant's location and spoke to him, Leskowski then left, went to the gas station and returned with other officers and the witness, who identified defendant as the perpetrator of the robbery. The court found the witness's identification supported probable cause for defendant's arrest, even though he was not arrested immediately following the witness's identification.

16

The court also considered whether the length of defendant's detention was reasonable. The court noted the imprecision in Storch's testimony about how much time passed between different incidents occurring after he directed defendant to sit on the curb, and the court found that from Storch's testimony the timing could not be credibly determined. The court, however, determined Leskowski's testimony, which the court found credible, clarified the timing and sequence of the events.

The court found that based on Leskowski's testimony, the witness's identification occurred approximately an hour after the start of the Terry stop, and it supported defendant's continued detention thereafter until defendant was arrested. The court also determined the approximately one-hour Terry stop was not unnecessarily prolonged by the officers who were investigating an armed robbery during which the victim was injured. The court concluded that based on all the circumstances, the Terry stop was lawful, and the court denied defendant's suppression motion.

Defendant subsequently pleaded guilty to first-degree robbery. The court imposed a ten-year sentence subject to the requirements of NERA. This appeal followed.

Defendant makes the following arguments:

17

POINT I

THE TRIAL COURT ERRED IN DENYING THE MOTION TO SUPPRESS EVIDENCE BECAUSE IT WRONGLY FOUND THAT DEFENDANT WAS DETAINED, RATHER THAN ARRESTED, WHEN HE WAS REQUIRED TO SIT ON THE SIDEWALK FOR AT LEAST AN HOUR WITH ARMED, UNIFORMED POLICE OFFICERS STANDING OVER HIM ON EACH SIDE.

POINT II

THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE BECAUSE THE STATE FAILED TO PROVE THAT DEFENDANT WAS NOT COERCED INTO LETTING POLICE LOOK INSIDE HIS BACKPACK WHEN HE WAS GIVEN AN ULTIMATUM TO CONSENT TO A SEARCH OF HIS BACKPACK OR REMAIN DETAINED INDEFINITELY.

POINT III

THIS COURT SHOULD REMAND FOR RESENTENCING FOR THE TRIAL COURT TO RECONSIDER DEFENDANT'S SENTENCE BASED ON THE NEW MITIGATING FACTOR, "THE DEFENDANT WAS UNDER [TWENTY-SIX] YEARS OF AGE AT THE TIME OF THE COMMISSION OF THE OFFENSE," N.J.S.A. 2C:44-1(b)(14), AND BECAUSE THE TRIAL COURT ERRED IN FAILING TO FIND THAT THE INTERESTS OF JUSTICE REQUIRED A DOWNGRADE.

A. The New Youth Mitigating Factor Law Should Be Given Retroactive Application.

18

B.  Alternatively, a Resentencing is Necessary Because the Trial Court Erred by Failing to Find That the Interests of Justice Required A Downgrade.

II.

Our review of a court's order denying a motion to suppress evidence is limited.  State v. Handy, 206 N.J. 39, 44 (2011).  We defer to a motion court's factual findings "so long as [they] are supported by sufficient credible evidence in the record." State v. Vincenty, 237 N.J. 122, 131-32 (2019) (quoting State v. Hubbard, 222 N.J. 249, 262 (2015)).  We do so even if an opportunity for independent review could lead to a different conclusion.  State v. Johnson, 42 N.J. 146, 162 (1964).  Whether established facts warrant the grant or denial of a suppression motion is a legal question subject to de novo review, Handy, 206 N.J. at 45, and, "[w]hen a question of law is at stake," our review is plenary, State v. Mann, 203 N.J. 328, 337 (2010).

Defendant does not challenge the court's finding he was restricted to the curb for an hour prior to the witness's identification of him as the perpetrator of the robbery.[6]  He also concedes the witness's identification established probable

---

[6]  Defendant does not dispute the court's factual finding he was restricted to the curb for thirty minutes with Storch and the other officers, before Leskowski first arrived at the defendant's location and that within thirty minutes after Leskowski's arrival, the female witness identified him as the perpetrator.

A-5454-18

cause for his arrest. He argues that his confinement to the curb for the hour constituted an unlawful de facto arrest without probable cause. He contends the court therefore erred by finding he was subject to a lawful investigative detention while confined to the curb.

Defendant also does not argue Storch improperly questioned him at the outset, either while Storch first drove alongside defendant as he walked, or after Storch exited the patrol car and walked with him. Defendant does not contend Storch did not have a reasonable and articulable suspicion of defendant's involvement in the robbery supporting a proper investigative detention. See State v. Shaw, 237 N.J. 588, 612 (2019) (explaining "[p]olice must have a particularized suspicion" based on "reasonable and . . . articulable facts" to support "an investigatory stop"); see also State v. Rosario, 229 N.J. 263, 272 (2017) (stating an investigatory detention "must be based on an officer's 'reasonable and particularized suspicion . . . that an individual has just engaged in, or was about to engage in, criminal activity'" (quoting State v. Stovall, 170 N.J. 346, 356 (2002))). To the contrary, defendant concedes Storch had reasonable and articulable suspicion he was the perpetrator of the armed robbery such that an investigative detention was proper.

Defendant claims the investigatory stop was unnecessarily long and intrusive and therefore constituted an unlawful de facto arrest long before the witness identified him as the perpetrator. "An investigative stop occurs when 'a reasonable person would have believed that he was not free to leave' and constitutes a 'seizure' under the Fourth Amendment." State v. Gibson, 218 N.J. 277, 291 (2014) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)). "The duration of an investigative stop must be limited in time and scope to the purpose that justified the stop in the first place." Ibid. (citing Florida v. Royer, 460 U.S. 491, 500 (1983)). In Royer, the Court explained an investigative stop must be temporary, must not last any longer than required to effectuate the stop's purpose, and must employ "the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time." 460 U.S. at 500.

"[A]n investigative stop becomes a de facto arrest when the officers' conduct is more intrusive than necessary for an investigative stop." State v. Dickey, 152 N.J. 468, 478 (1998) (quoting United States v. Jones, 759 F.2d 633, 636 (8th Cir. 1985)). Factors relevant to determining if an investigative stop has become a de facto arrest include: the duration of the stop, if it involves unnecessary delay; "the degree of fear and humiliation that the police conduct

21

engenders"; "transporting a suspect to another location or isolating him from others"; "subjecting a suspect to unnecessary delays, handcuffing him, or confining him in a police car." Id. at 479 (quoting United States v. Bloomfield, 40 F.3d 910, 917 (8th Cir. 1994)); see also Shaw, 237 N.J. at 612-13.

"Case law has recognized law enforcement's need to respond to the fluidity of a street encounter where there is a reasonable suspicion of wrongdoing; accordingly, the duration of the investigative stop may be extended for a reasonable but limited period for investigative purposes." State v. Coles, 218 N.J. 322, 344-45 (2014). "In assessing whether a detention is too long in duration to be justified as an investigative stop, [courts] . . . examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to" continue to detain the defendant. Dickey, 152 N.J. at 477 (quoting United States v. Sharpe, 470 U.S. 675, 686 (1985)). Further, to avoid a detention becoming a de facto arrest, the "'detention must be reasonable at both its inception and throughout its entire execution.'" Shaw, 237 N.J. at 612 (quoting Coles, 218 N.J. at 344). "Once a de facto arrest occurs, the particularized suspicion that originally supported the investigatory detention is no longer sufficient and the arrest must be supported by probable cause." Coles, 218 N.J. at 346.

Our Supreme Court has determined as "[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." Dickey, 152 N.J. at 476-77 (quoting Sharpe, 470 U.S. at 685). Further, the United States Supreme Court has "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." Sharpe, 470 U.S. at 685.

Here, the officers were confronted with a report of an armed robbery in which a victim was injured, and they responded quickly to the area where the robbery occurred searching for the suspect. Storch had a reasonable and articulable suspicion defendant committed the offense based on defendant's physical proximity to the crime and the temporal proximity of his presence near the crime scene: his physical characteristics were consistent with the description of the suspect; his inconsistent, incredible, and contradictory responses to Storch's questions; and his signs of nervousness, including his darting eyes and excessive perspiration on a cool evening.

The officers' means of detaining defendant were not particularly intrusive. Even though the officers had a reasonable and articulable suspicion defendant may have committed an armed robbery, Storch did not pat-down defendant or

search his backpack for weapons during the investigative detention. Defendant was not handcuffed, placed in a police car, or transported to another location. The officers did not draw their weapons or threaten defendant, and they testified their discussions with him were at all times in a conversational tone. They told defendant the reason they required him to remain — they were attempting to determine whether he was the proper suspect — and they required only that defendant remain at the curb in a public place while the officers attempted to resolve that issue. There is no evidence the officers took any action that was "more intrusive than necessary for an investigatory stop." Dickey, 152 N.J. at 478: see also Shaw, 237 N.J. at 612-13 (explaining "important factors" in determining when a "prolonged investigative stop turns into a de facto arrest . . . include unnecessary delays, handcuffing the suspect, confining the suspect in a police car, transporting the suspect, isolating the suspect, and the degree of fear and humiliation engendered by the police conduct").[7]

Also, within one half hour of the start of the investigative detention, the police developed additional evidence that more strongly supported a reasonable and articulable suspicion defendant was the perpetrator of the armed robbery.

---

[7] We note there is no evidence defendant suffered any fear or humiliation that was engendered by the officers' conduct.

As noted, during the initial phase of the investigative detention — before Leskowski first arrived — defendant opened his backpack and Storch observed the black baseball cap that was consistent with the earlier report describing what the suspect wore during the robbery. This information contributed to the ongoing investigation, and further supported defendant's detention while the police continued their diligent and ongoing efforts to determine if defendant was the correct suspect.

There is no evidence the officers unduly delayed the investigative stop. To the contrary, within an hour of initiating the investigatory detention, Leskowski had traveled to defendant's location based on the report Storch had stopped a suspect, he spoke to defendant in an effort to obtain information pertinent to the investigation, and he traveled to the crime scene, where other officers had already identified a witness. Leskowski also caused the witness to go to defendant's location, where she identified defendant as the perpetrator. As the motion court correctly recognized, and as defendant concedes on appeal, it was at that point — within one hour of the initiation of the investigative detention — that probable cause to arrest defendant was established.

"There is 'no rigid time limitation on Terry stops.'" State v. Chisum, 236 N.J. 530, 546 (2019) (quoting Sharpe, 470 U.S. at 685). Given the totality of

25

the circumstances presented by the ongoing and quickly undertaken investigation of a very serious crime, during which an armed suspect injured the victim during the course of a robbery, we do not find the one-hour investigative detention unreasonable.  At all times, the officers "diligently pursued a means of investigation that was likely to confirm or dispel their suspicion[]" defendant was the correct suspect "during which it was necessary to detain" defendant.  Dickey, 152 N.J. at 477 (quoting Sharpe, 470 U.S. at 686); see also Chisum, 236 N.J. at 547.  Thus, defendant was lawfully detained prior to the witness's identification of him as the perpetrator of the robbery, at which time there was probable cause for his arrest.  The court properly denied defendant's motion to suppress physical evidence seized following his arrest.

III.

Defendant also argues Storch's perusal of the hat in the backpack constitutes an unlawful search because defendant opened the backpack in response to a coercive ultimatum that he consent to a search of the backpack or "remain detained indefinitely."  We are not persuaded.

"Consent searches under the New Jersey Constitution are afforded a higher level of scrutiny."  State v. Carty, 170 N.J. 632, 639 (2002).  The State has the burden to prove that consent was "clear, knowing, voluntary,

unequivocal, and express." State v. Sugar, 100 N.J. 214, 234 (1985). Voluntariness must be determined from all the surrounding circumstances, Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973), because consent contemplates an exercise of choice, "and choice entails the opportunity to evaluate the available options," State v. Johnson, 68 N.J. 349, 355 (1975) (Schreiber, J., concurring); see also State v. Chapman, 332 N.J. Super. 452, 466 (App. Div. 2000).

The State is required to prove a valid waiver of the right to refuse consent by "clear and positive testimony." State v. King, 44 N.J. 346, 352 (1965). Our Supreme Court has identified several factors in determining voluntariness of consent. Factors tending to show that consent was not voluntary include that consent was given: (1) by an individual while under arrest; (2) despite a denial of guilt; (3) only after the accused had refused initial requests for consent to search; (4) where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered; and (5) while the defendant was handcuffed. Id. at 352-53. Factors tending to show voluntariness of consent to search include that the accused: (1) had reason to believe that the police would find no contraband; (2) admitted guilt before giving consent; and (3) affirmatively assisted the police officers. Id. at 353.

A-5454-18

These factors are only "guideposts," because "[e]very case necessarily depends upon its own facts. Thus, the existence or absence of one or more of the aforementioned factors may be of great significance in the circumstances of one case yet be of slight significance in another." Id. at 353.

Here, the court considered the King factors, noting that although defendant had rejected prior suggestions he could consent to a search, and he had denied guilt concerning the robbery during his conversations with Storch and throughout the investigative detention, he was not under arrest when he opted to open a compartment in his backpack to briefly show the officers what was inside. Defendant also was not handcuffed.

During his interactions with the officers, they never directly requested defendant's consent to search his backpack. Instead, they merely informed him he could help them more quickly determine if he was the correct suspect if he consented to a search. In each exchange defendant had with Petrola to that effect, Petrola informed defendant he had a right to refuse consent, and, if he gave consent, he could end the search at any time. As the court found, on three occasions prior to his decision to open the backpack, defendant exercised his right to refuse consent.

Defendant's decision to open the backpack was not made in response to a request from any officer. Instead, apparently anxious to leave the scene of the investigative detention, defendant offered to open the backpack. Further, defendant assisted the officers in conducting the search. He held the backpack at all times; he unzipped the compartment he selected; and he closed the compartment after opening it only for a few seconds. The court found defendant's decision was a tactical one, made voluntarily to show only a portion of the backpack's interior for the purpose of obtaining permission to leave. However, even after defendant offered to show the officers the backpack, Petrola again reminded him that he was not obligated to consent, he could refuse consent, and, if he consented, he could stop the search at any time. In response to Petrola's statements, defendant unzipped the backpack and showed it to Storch.

We reject defendant's claim the search was coercive because the officers, in response to defendant's oft-repeated stated desire to leave the scene, advised him he could help them determine if he was the correct suspect by consenting to a search of his backpack. In State v. Hagans, 233 N.J. 30, 41-42 (2018), the Court held that consent to a search of an automobile was given voluntarily, "without any type of coercion," despite police officers advising the driver of the

vehicle that not allowing the search of the car was "only prolong[ing] the inevitable," after the driver initially refused consent to search. The Court found the officer's repeated explanation that the driver did not need to consent to the search of the vehicle, "reminding her of her right to refuse consent," supported the determination the driver "knowingly and voluntarily consented" to the officer's search. Id. at 41, 43. The Court's holding applies with syllogistic precision here.

The trial court considered the King factors as guideposts, and found defendant made a fully informed and voluntary decision to consent to the search. We discern no basis to question its findings of fact or conclusion the State satisfied its burden of establishing the search was the product of a knowing and voluntary consent. Defendant was fully aware of his right not to consent, and made a voluntary decision, for tactical reasons, to offer the officers a brief glimpse into his backpack. Storch's glimpse into the backpack was lawful and does not permit or required the suppression of evidence later seized.

IV.

Defendant also makes two arguments challenging his sentence. He claims he is entitled to a remand for resentencing because the court is obligated to consider his relative youth as a mandatory statutory mitigating factor under

N.J.S.A. 2C:14-1(b)(14). He also argues the court erred in its assessment of the aggravating and mitigating factors under N.J.S.A. 2C:44-1(a) and (b), and had the court properly found and weighed the factors, it should have determined he is entitled to be sentenced in the range for a crime one-degree lower as permitted under N.J.S.A. 2C:44-1(f)(2). We consider the arguments in turn.

The court sentenced defendant on May 31, 2019. The court imposed the minimum sentence within the range for a first-degree offense, an aggregate ten-year prison term, subject to NERA's requirements. See N.J.S.A. 2C:43-6(a)(1) (setting sentencing range for a first-degree offense between ten and twenty years). The following year, the Legislature enacted an amendment to N.J.S.A. 2C:44-1(b), adding a fourteenth mitigating factor, "[t]he defendant was under 26 years of age at the time of the commission of the offense," and declaring the amendment was "effective immediately." L. 2020, c. 110 § 1, eff. Oct. 19, 2020 (codified at N.J.S.A. 2C:44-1(b)(14)).

Defendant argues that although the amendment was not effective until seventeen months after his sentencing, it should be given pipeline retroactivity and therefore requires a remand for resentencing. "Pipeline retroactivity" is the retroactive application of a new law to a case that is in the process of direct

31

appeal, or pipeline, at the time the law became effective. State v. G.E.P., 243 N.J. 362, 370 (2020).

A determination whether a statute applies retroactively "is a purely legal question of statutory interpretation." State v. J.V., 242 N.J. 432, 442 (2020) (quoting Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 386 (2016)). In making the determination, "[t]he overriding goal . . . 'is to determine as best [this court] can the intent of the Legislature, and to give effect to that intent.'" Id. at 442 (first alteration in original) (quoting State v. S.B., 230 N.J. 62, 67 (2017)). We must "look to the statute's language and give those terms their plain and ordinary meaning." Ibid.; see Johnson, 226 N.J. at 386 (explaining "the best indicator of that intent is the plain language chosen by the Legislature" (quoting Cashin v. Bello, 223 N.J. 328, 335 (2015))). Where the terms are "clear and unambiguous, then the interpretive process ends, and" this court must "apply the law as written." Id. at 443 (quoting Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012)). Where "the statutory text is ambiguous, we may resort to 'extrinsic interpretative aids, including legislative history,' to determine the statute's meaning." Ibid. (quoting S.B., 230 N.J. at 68).

Our Supreme Court has found the Legislature's declaration that a statute is "effective immediately" reflects a determination the statute shall have

prospective effect.  For example, in <u>Pisack v. B & C Towing, Inc.</u>, the Court held the Legislature's determination and declaration a statute shall be effective immediately "bespeak[s] an intent contrary to, and not supportive of, retroactive application."  240 N.J. 360, 371 (2020) (quoting <u>Cruz v. Cent. Jersey Landscaping, Inc.</u>, 195 N.J. 33, 48 (2008)).  Similarly, in <u>State v. Parolin</u>, the Court held that amendments to NERA, removing the offense for which the defendant was convicted from NERA's coverage, did not apply retroactively because the Legislature provided the amendment would "take effect immediately."  171 N.J. 223, 233 (2002).

We may properly presume the Legislature was fully aware of judicial interpretations of statutory language, <u>N.J. Democratic Party, Inc. v. Samson</u>, 175 N.J. 178, 195 n.6 (2002), and therefore the Legislature understood that, consistent with the Court's decisions in <u>Pisack</u> and <u>Parolin</u>, making N.J.S.A. 2C:44-1(b)(14) "effective immediately" constituted a clear and unambiguous declaration the amendment was prospective only.[8]  <u>See</u> <u>Pisack</u>, 240 N.J. at 371; <u>Parolin</u>, 171 N.J. at 233.  "Thus, the Legislature is deemed to have been fully aware that," if it sought to make application of mitigating factor prospective, it

_____

[8]  The Court decided <u>Pisack</u> on January 16, 2020, ten months before the enactment of N.J.S.A. 2C:44-1(b)(14).  240 N.J. at 360.  The Court decided <u>Parolin</u> in 2002.  171 N.J. at 233.

should not have declared it effective immediately, and "should have expressly provided for such application in the amendment's text."  Olkusz v. Brown, 401 N.J. Super. 496, 502 (App. Div. 2008).

The statute also does not include any language suggesting an intent that it apply prospectively or rendering its "effective immediately" language something other than the declaration of prospective application recognized in Pisack and Parolin.  See Olkusz, 401 N.J. Super. at 502 (noting "the Legislature's silence on the question of retroactivity" in the face of canons of statutory construction supporting prospective application "is akin to a legislative flare, signaling to the judiciary that prospective application is intended").

For those reasons, we reject defendant's claim mitigating factor fourteen, N.J.S.A. 2C:44-1(b)(14), should be given retroactive application.  The clear and unambiguous language used by the Legislature, and as consistently interpreted by our Supreme Court, does not permit an interpretation that the amendment applies retroactively to individuals, like defendant, who were sentenced prior to October 19, 2019.  As we held in State v. Bellamy, mitigating factor fourteen does not apply retroactively to sentences imposed prior to the effective date of N.J.S.A. 2C:44-1(b)(14), and the mitigating factor may properly be applied only to sentencings, including re-sentencings following a remand on appeal,

occurring on or after N.J.S.A. 2C:44-1(b)(14)'s October 19, 2019 effective date. 468 N.J. Super. 29, 46-48 (App. Div. 2021).

Because the clear and unambiguous language of the statutory amendment does not permit retroactive application under the circumstances presented here, see id. at 48, it is unnecessary to address defendant's remaining arguments supporting its claim the statute should be applied retroactively, see J.V., 242 N.J. at 443 (explaining a court's interpretation of a statute ends where the statute's terms are clear and unambiguous).

Defendant also argues the court improperly considered the mitigating and aggravating factors at his sentencing, and "had the court conducted a proper weighing of the applicable aggravating and mitigating factors, the court would have concluded that a downgraded sentence in the second-degree range was required" under N.J.S.A. 2C:44-1(f)(2). He contends the court failed to "provide a reasoned explanation for its conflicting finding of aggravating factor three and mitigating factor seven," N.J.S.A. 2C:44-1(a)(3); N.J.S.A. 2C:44-1(b)(7); "it was error for the [trial] court to give great weight to aggravating factor nine," N.J.S.A. 2C:44-1(a)(9); and the trial "court also failed to address mitigating factors four and nine, as were requested by [his] counsel." Defendant claims that had the factors properly been considered, the court should have imposed a

sentence in the second-degree range for his first-degree robbery conviction as permitted under N.J.S.A. 2C:44-1(f)(2).

"Appellate courts review sentencing determinations in accordance with a deferential standard. The reviewing court must not substitute its judgment for that of the sentencing court." State v. Fuentes, 217 N.J. 57, 70 (2014). We must affirm a sentence unless: 1) the trial court failed to follow the sentencing guidelines; 2) the court's findings of aggravating and mitigating factors were not based on competent and credible evidence in the record; or 3) "the [court's] application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience." Id. at 70 (second alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). "When the court fails to provide a qualitative analysis of the relevant sentencing factors on the record, an appellate court may remand for resentencing." Ibid.

We first consider defendant's claim the court erred by failing to sentence him in the second-degree range for his conviction of first-degree robbery as permitted under N.J.S.A. 2C:44-1(f)(2). The statute provides a court may sentence a defendant "to a term appropriate to a crime of one degree lower than that of the crime for which the defendant was convicted," if "the court is clearly

A-5454-18

convinced that the mitigating factors substantially outweigh the aggravating factors and where the interest of justice demands." N.J.S.A. 2C:44-1(f)(2).

To sentence a defendant within a range one-degree lower than the crime for which the sentence is imposed, the court must not only "consider general sentencing principles," it "must [also] consider whether there is a compelling reason to downgrade defendant's sentence in the interest of justice under section 44-1(f)(2)." State v. Megargel, 143 N.J. 484, 501 (1996). "The reasons" for the downgrade "must be in addition to, and separate from, the 'mitigating factors which substantially outweigh the aggravating factors,' that the trial court finds applicable to a defendant under the first prong of [N.J.S.A. 2C:]44-1(f)(2)." Ibid.

Moreover, when deciding whether a downgrade is appropriate, the focus must be on the crime because the downgrade statute "is an offense-oriented provision." State v. Lake, 408 N.J. Super. 313, 328 (App. Div. 2009). The sentence must "reflect the Legislature's intent that the severity of the crime [is] the most single important factor in the sentencing process." Megargel, 143 N.J. at 500. A trial court should not downgrade if the "surrounding circumstances of an offense" do not "make it very similar to a lower degree offense." Ibid. The court should also consider the defendant's "role in the incident to determine the

need to deter him from further crimes and the corresponding need to protect the public from him." Id. at 501.

We discern no abuse of the court's discretion in its determination defendant was not entitled to a sentence in the second-degree range under N.J.S.A. 2C:44-1(f)(2). In finding no compelling circumstances warranting a downgrade of the sentencing range, the court properly considered the circumstances of the offense and defendant's role in it, and found the crime was premeditated, carefully planned, and involved the use of a weapon that caused injury to the victim. And defendant does not argue there is a crime in the second-degree range similar to the armed robbery he committed here. See id. at 500.

Defendant's argument that a reassessment of the aggravating and mitigating factors would result in a finding of a compelling reason establishing that a downgrade in the sentencing range is in the interest of justice, ignores that the reasons establishing the interest of justice required under N.J.S.A. 2C:44-1(f)(2) must be separate, and in addition to, the weighing of aggravating and mitigating factors. Id. at 501. The court correctly recognized and applied that

legal standard and did not abuse its discretion in denying defendant's request for the sentencing range downgrade.[9]

Defendant also claims the court erred by finding aggravating factor three, the risk that defendant will commit another offense, N.J.S.A. 2C:44-1(a)(3), because it conflicts with the court's finding of mitigating factor seven, defendant did not have a prior criminal record, N.J.S.A. 2C:44-1(b)(3). He relies on State v. Case, where the Court found factor seven "stood as a counterpoise to the finding of a risk that defendant was likely to commit another offense." 220 N.J. 49, 67 (2014). The Court did not, however, determine a finding of mitigating factor seven precluded a finding of aggravating factor three, and it explained it "did not presume" the two factors could not "coexist." Ibid. The Court found the sentencing court erred because it did not make its finding of aggravating factor three "grounded on competent, credible evidence," or "give a reasoned

---

[9] As we explain, the court also correctly denied the request for the sentencing downgrade based on its finding and weighing of the aggravating and mitigating factors. As noted, a court must first find the mitigating factors substantially outweigh the mitigating factors in order to consider downgrading the sentencing range under N.J.S.A. 2C:44-1(f)(2). Here, the record supports the court's determination the aggravating factors outweighed the mitigating factors, and, for that additional reason, a downgrade of the sentencing range was not appropriate under N.J.S.A. 2C:44-1(f)(2).

explanation for its conclusion [the] first-time offender presented a risk to commit another offense." Ibid.

Here, the sentencing court provided the reasoned explanation for its findings of aggravating factor three and mitigating factor seven that the Court found lacking in Case. The sentencing court found that despite defendant's lack of a prior record, there was a risk he would commit another offense because he had carefully planned and executed the very serious crime, armed robbery, for which he was convicted. We find no abuse of discretion in the court's reasoning or determination.

Defendant also claims the court erred by failing to find mitigating factor four, there were substantial grounds tending to excuse defendant's conduct, N.J.S.A. 2C:44-1(b)(4). Defendant claims he has a history of being abused and attendant emotional issues supporting a finding of mitigating factor four. We are not persuaded by the claim because there is no evidence the purported history or emotional issues played a role in his commission of the robbery. Indeed, during the presentence investigation, defendant reported to the probation department he committed the robbery because he was "desperate and needed money."

A-5454-18

We similarly reject defendant's claim the court erred by failing to find mitigating factor nine, the character and attitude of defendant show he is unlikely to reoffend, N.J.S.A. 2C:44-1(b)(9). He claims even the court noted he had taken responsibility for the commission of the robbery and had utilized his time in custody prior to sentencing to participate in various programs designed to reduce defendant's chances of recidivism. He argues the court then erred by failing to find his character and attitude was such that he was unlikely to reoffend.

The court was aware of defendant's self-improvement efforts while in custody; the court mentioned them during the sentencing proceeding. The court, however, was not persuaded those efforts established defendant had the character and attitude of an individual unlikely to reoffend. Again, the court focused on defendant's actions in carefully planning the robbery—with a disguise, hidden clothes for a change after the commission of the crime, and the use of a weapon—as reflective of a character and attitude evincing a likelihood of reoffending. That is the reason the court found aggravating factor three, and that is the reason the court did not find mitigating factor nine. Again, we discern no abuse of discretion in the court's findings, which are supported by the record.

A-5454-18

Defendant's remaining sentencing arguments, as well as any other arguments made on appeal that we have not directly addressed, are without sufficient merit to warrant any further discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5454-18